68   370
180   575

68       370
19 SC ³500

## Audenried *versus* The Philadelphia and Reading Railroad Co.

1. The object of a preliminary injunction is simply preventive, to maintain things as they are until the rights of the parties can be considered and determined after a full hearing.

2. Preliminary injunction is never awarded except when the equity of the complainant is clear, supposing the facts of which he gives primâ facie evidence to be ultimately established.

3. All injunctions are for restraint, yet final injunctions may go beyond this and command acts to be done or undone; they then are termed mandatory.

4. A tribunal which finds itself unable directly to decree a thing should not attempt to accomplish it by indirection.

5. It is very unusual to take testimony by an examiner on a motion for preliminary injunction.

6. Transportation by a common carrier is open to the public upon equal and reasonable terms.

7. An exclusive right granted to a common carrier only, is inconsistent with the rights of all others.

At Harrisburg, May 23d 1870. Before THOMPSON, C. J., AGNEW and SHARSWOOD, JJ.

Appeal from the decree at Nisi Prius: In Equity: No. 60, to January Term 1870.

The bill was filed by Lewis Audenried, Addison Child, and others, trading as Lewis Audenried & Co., against The Philadelphia and Reading Railroad Company.

The bill set out amongst other things that the defendants were owners of railroads from the Schuylkill coal regions used for transporting coal to the river Delaware, for shipment to places outside of the state of Pennsylvania, affording the only access from some of the collieries to the market. The coal sent to Port Richmond is loaded into vessels at wharves there owned by defendants; prior to 1868, it had been customary to allot the wharves to the persons engaged in the trade; since 1868 the defendants had shipped all coal, charging for expense of receiving, dumping, storing, &c. Since then the defendants have allotted wharf room by designating a space where each shipper may dump his coal for the defendants to receive and load into vessels, thus making the defendants carriers from the mines until the coal is in the vessels; the defendants are paid for loading "exactly as for tolls and freight." It is essential for shippers that there should be a place on the wharves on which their coal should be deposited until vessels are ready, as it is impossible to regulate the arrival of vessels and cars so that the vessels may be at once loaded, while it is essential to the interests of the company that the cars should not be detained: the defendants therefore make a charge for the detention of cars; for these reasons and for the interest of the defendants, and to enable shippers to accumulate reasonable stores

[Audenried *v.* Phil. & Reading Railroad Co.]

of coal to suit the demand for different varieties, "the custom has uniformly prevailed."

. Lewis Audenried, one of the plaintiffs, was one of the first shippers that occupied a wharf, having taken one in 1842, and has by himself and the other plaintiffs his partners, occupied one until 1868, and until within a few days they have for two years occupied wharf No. 11 as shippers to New York, Boston and various other ports, and have been if not the largest, one of the largest shippers; they had always conformed to the defendants' regulations as to the use of the road, cars and wharves; they have entered into many contracts for the delivery of coal on the expectation of having the wharf facilities continued, &c. But the defendants, with the avowed determination to compel them to submit to a demand not connected with wharf facilities, but arising out of a past transaction, have deprived the plaintiffs of the use of the wharf and refuse to give them such facilities as will enable them to conduct their business on the road. The plaintiffs then set out the character of the demand, growing out of a charge by the defendants that the plaintiffs had improperly availed themselves of drawbacks. They set out at large the circumstances under which the demand of the defendants arose; the plaintiffs offered to submit the question to the arbitrament of the former president of the defendants with whom the contract as to the drawbacks had been made, or to litigate in the courts; "but in vain;" and on the 15th of March 1870, they were notified that they could not be allowed wharf facilities at Richmond; on application for a place to dump their coal they were refused.

They charged that the defendants' action is unjust, illegal and oppressive, and would tend to the great and irreparable injury of the plaintiffs, and for ever put shippers under the control of the managers of the road, and the refusal of these wharf facilities is practically a refusal to allow the plaintiffs to carry on their business for shipping coal over the Philadelphia and Reading Railroad intended for shipment at Port Richmond.

"27. They further charge, that the company insists:

"1. They are the absolute owners of the said wharves and can exercise their rights regardless of motive.

"But the plaintiffs charge that having so constructed their road that these wharves are essential to the shipping trade over the road, the said wharves being at the terminus of the road, which is the Delaware river, are also parts of the road and subject to the same rules as the residue of the road, so far as concerns shippers over said road intending to ship into vessels at the terminus, and the company cannot so use their rights as to affect injuriously the rights of some persons using the road, but which do not affect others similarly circumstanced, but must allow such a use of the

wharves as will enable all shippers practically to use the road as it is held out to the public it is intended to be used.

" 2. That there is not room for all, and that they are entitled to discriminate.

"But the plaintiffs charge, that they cannot discriminate between persons similarly circumstanced, and that your orators are prepared, and have always been, to furnish as much coal and on the same terms, as the most favored of those who have the use of the wharves. And they further charge that the real motive of the company was to coerce the plaintiffs, and this was distinctly threatened in a letter from the president of the company, dated February 1st 1870, and that under no circumstances can such a right be exercised from such motives.

" 3. That they have allotted all the wharves and there is no room left.

" The plaintiffs charge the contrary to be the truth, and that no pretence of allotment of the wharf hitherto occupied by them, was made until the 15th of March, about a month after the allotment was made of the wharves generally for the trade, and that the company have it in their power, if compelled or willing, to find abundant wharf room for your orators' accommodation. And further, that the allotment of this wharf was made for the very purpose of barring this application, and the threatened redress of the plaintiffs' wrongs, and that the company should not be permitted to continue to allow such use as will hinder the plaintiffs from their share, even though it may be compelled to compensate persons to whom they may have made these allotments. And that it is but aggravation of the wrong to pretend to use the franchises granted them in the manner best calculated to serve the public, while in truth this is done as an act of vengeance or to coerce submission to demands which should be the subject of suits.

" 4. They pretend that the conduct of the plaintiffs justifies them in this refusal of accommodations.

" But the plaintiffs charge that the defendants, as carriers, cannot refuse to give them equal facilities with others similarly circumstanced as they are, because of a refusal by them to repay money obtained by them from the defendants, even if obtained by fraud, much less if there be a doubt or question as to the right of the company. Such a pretence, once admitted, would enable the company, or any other transporting company, to compel payment of any demand at the peril of the destruction of the trade of the alleged debtor carried on over the road. And more especially is this so when the demand is not for anything connected with the trade that is asked to be carried on, but because of past transactions and those not connected with the regulations of the wharves or shipments, but for what is at most a payment by mistake of a bonus on coal previously carried and sold."

[Audenried v. Phil. & Reading Railroad Co.]

The prayers were:

I. That the court will declare and establish the rights of the plaintiffs to so much or such a portion of wharf room and shipping facilities in every particular, as will put them on an equality in all respects as to conveniences for receiving, storing and shipping coal at Richmond, with any other shipper in proportion to the business done by them and such other shippers.

II. That the defendants be restrained from refusing to allow or continue to the plaintiffs such facilities as aforesaid, as are required for the purposes aforesaid.

III. That the defendants be restrained from allowing any other person or persons to use any part or parts of the said wharves for receiving and storing coal preparatory to the shipping of the same, while, and so long as the defendants omit to furnish the plaintiffs with similar facilities, in a due proportion as compared with those enjoyed by such other persons furnishing similar quantities of coal to the railroad company for shipment at that place and under the same regulations.

IV. And that the defendants be restrained from hindering or otherwise obstructing the plaintiffs in conducting their business on this road and wharves in the same manner and with equal facility as any other person or persons using the said road.

V. General relief.

The bill was accompanied by the affidavits of Addison Child, Lewis Audenried and W. G. Audenried, three of the plaintiffs, deposing that the averments in the bill were true, and also deposing as to parts in detail.

C. H. T. Collis, Esq. was appointed examiner to take depositions of witnesses to be read on hearing the motion for a preliminary injunction.

Much testimony was taken upon the allegations in the bill and with reference to the allotments of the wharf facilities theretofore used by the plaintiffs.

April 29th 1870, at Nisi Prius, Mr. Justice Read made this decree: "It is ordered that an injunction do issue, as prayed in the second, third and fourth clauses of the prayers of the bill filed in this cause, enjoining and restraining the defendants as therein prayed, until the further order of this court, upon the plaintiffs giving bond, &c."

The defendants appealed to the court in banc and assigned the decree for error.

J. E. Gowen and Meredith, for appellants.

1. The delay in filing the bill is a sufficient answer to the prayer for a preliminary injunction: Hilliard on Injunctions, p. 24, s. 43; Tush v. Adams, 10 Cush. 253; Binney's Case, 2 Bland.

[Audenried *v.* Phil. & Reading Railroad Co.]

99; Hodges on Railways 759;·Illingworth *v.* Manchester and Leeds R. W. Co., 2 Railway Cases 187.

2. The sole object of a preliminary injunction is to preserve the subject of the controversy in the condition in which it was when the order was made: Farmers' Railroad Company *v.* Reno, &c., Co., 3 P. F. Smith 224; Mam. Vein C. C. Co.'s Appeal, 4 P. F. Smith 183.

3. The plaintiffs have no more right to the exclusive use of one of defendants' coal piers for storing and shipping their coal, than they have to the use of one of defendants' coal-yards or ordinary warehouses.

4. Even in the case of an ordinary railroad yard at a station or depot, the railroad company is not bound to admit every one who proposes to carry on the business of receiving and delivering freight there, much less to appropriate to him the exclusive use of yard-room or depot-room for the more convenient transaction of his business: Barker *v.* Midland Railway Co., 18 Com. Bench 46; Beadell *v.* Eastern Co.'s Railway Co., 2 Com. B. N. S. 509; Painter *v.* L. B. & S. R. W., 2 Com. Bench N. S. 702; Marriot's Case, 1 Com. Bench N. S. 498; s. c. 40 Eng. Law and Eq. 250.

5. Where the facilities of a railroad company are inadequate to accommodate all applicants, no one can insist upon a special and absolute right in himself, nor must the company refuse to accommodate any, because they cannot accommodate all; and in making a selection, the company has the right to exclude those who abused the facilities in question when they enjoyed them to its injury and discredit: Oxlade *v.* North Eastern Railway, 1 Com. Bench N. S. 454; 2 Redfield on Railways 69, s. 4; Id. p. 217; Angell on Carriers, s. 125, and note 1; s. 524 and following; Chitty on Carriers, p. *247; Riley *v.* Horne, 5 Bing. 217; Cole *v.* Godwin, 19 Wend. 261; Jencks *v.* Coleman, 2 Sumner 221; Palmer *v.* London and South Western Railway, 1 Law Reports C. P. 588; Ransome *v.* E. Counties Railway, 38 Eng. L. and Eq. 232; s. c. 1 C. B. N. S. 437; Nicholson *v.* Gt. Wn. Railway, 5 C. B. N. S. 366; 2 Redfield on Railways 218.

*R. C. McMurtrie* and *G. W. Biddle,* for appellees.—1. The railroad company as a common carrier cannot directly or indirectly use their franchises so as practically to exclude one man from an advantage which others are allowed to enjoy.

2. That the railway tracks running over and upon the wharves are thus a connecting link between the road and the water highway, and are subject to the same rules as the road.

3. The avowed motive is no justification. A carrier has a lien for his freight, but he has none for an old debt. If he cannot refuse to deliver on tender of freight due on that cargo, *a fortiori* can he not refuse to transport till the old debt is paid.

[Audenried *v.* Phil. & Reading Railroad Co.]

4. The road and the wharves, though property of the company, are qualified property. The public have an interest. The right to build a road and hold property was granted for the public service, and can only be used lawfully.

5. Where a corporation refuses the use of its property to a particular member of the public, they must justify for special reasons applicable to that person, or that occasion; and whether this was the motive, or whether their conduct was founded on sufficient reasons, is traversable: Dummer *v.* The Corp'n of Chippenham, 14 Ves. 252; Hill on Trustees 488; 1 Chitty Pl. 612—14.

6. Where they owe a duty they will be compelled to perform it; if they have entangled themselves with inconsistent engagements they will be prohibited from acting in such way as will disable them from performing the duty: Kerr on Inj. 230; Com. *v.* Pittsburg and Connellsville Railroad, 12 Harris 159; Sanford *v.* The Catawissa Railroad, Id. 380; Baptist Congregation *v.* Scamnel, 3 Grant 48; People *v.* Vanderbilt, 12 Smith N. Y. 287; Niagara *v.* Great Western Railroad, 39 Barbour 212; Baltimore *v.* Porter, 18 Maryland 284.

7. If the fact that they have made contracts which deprive them of capacity serves as an excuse against fulfilling an obligation, there will never be another case of compelling a railway to perform.

8. They say they have not sufficient wharves for all and hence they must discriminate. But if this discrimination is not for the benefit of the road, but a mere stalking-horse to cover and conceal the real motive, and that is an unlawful one, then the court will examine and redress.

9. And if they are compelled to select and discriminate, then they must do it by dividing—not by excluding.

The opinion of the court was delivered by

SHARSWOOD, J.—There are two kinds of injunctions in courts of equity. The one is preliminary or interlocutory; the other final or perpetual. The object of the first in general is simply preventive—to maintain things in the condition in which they are at the time until the rights and equities of the parties can be considered and determined after a full examination and hearing. A preliminary injunction is never awarded, except when the rights or equity of the plaintiff are clear, at least supposing the facts of which he gives primâ facie evidence to be ultimately established.

All injunctions are generally processes of mere restraint; yet final injunctions may certainly go beyond this and command acts to be done or undone. They are then termed mandatory. They are often necessary to do complete justice. But the authorities, both in England and this country, are very clear that an inter-

[Audenried *v.* Phil. & Reading Railroad Co.]

locutory or preliminary injunction cannot be mandatory. In Gale *v.* Abbott, 8 Jurist, N. S. 987, Vice-Chancellor Kindersley said: " It was useless to come for what was called a mandatory injunction on an interlocutory application. Such an application was one of the rarest cases that occurred, for the court would not compel a man to do so serious a thing as to undo what he had done, except at the hearing." So in Child *v.* Douglass, Kay 578, Vice-Chancellor Sir W. Page Wood, now Lord Chancellor Hatherley, noticed the same distinction: " The plaintiff has a right to an injunction to restrain the building of the wall until further order ; but I can make no order on an interlocutory application as to that part of the motion which relates to pulling down what has already been built."

It was said by Chancellor Bland, in Murdoch's Case, 2 Bland 469 : " To restrain a defendant from making any abusive use of the property in question, or from disposing of it past recall, amounts to no more than the imposition of a temporary limitation upon the free exercise of his right, even if it should eventually appear to be entirely and rightfully his ;" which is quite as far as any court can go in the first instance, and as preparatory to a fair beneficial hearing and final adjudication.

It was held accordingly in The Washington University *v.* Green, 1 Md. Ch. 97, that an injunction, unless issued after the final decree, when it becomes a judicial process, can only be used for the purpose of prevention and protection, and not for the purpose of commanding the defendant to undo anything which he had previously done. To the same effect are The New York Printing and Dyeing Establishment *v.* Fitch, 1 Paige 97 ; Bosley *v.* The Susquehanna Canal, 3 Bland 65 ; Attorney-General *v.* New Jersey Railroad Company, 2 H. W. Green's Ch. R. 136 ; Attorney-General *v.* City of Patterson, 1 Stockton 624. This distinction between a preliminary and final injunction is fully recognised in our own decisions.

Mr. Justice Strong states it in his opinion at Nisi Prius, in The Lehigh Coal and Navigation Co. *v.* The Lehigh Valley Railroad Co., January 1855, No. 59, April 5th 1855, in which he says : " A preliminary injunction ought never to be granted except in a clear case, and then only to prevent a substantial injury. Its purpose is to keep things in their existing condition until the case can be finally heard. As it is the strong arm of the law, it must be used only when necessity requires it. And a preliminary injunction can never be necessary when the thing sought to be restrained has been already done ; for its province is not to undo but to prevent and preserve."

The same learned judge, delivering the opinion of the whole court in Farmers' Railroad Co. *v.* Reno, &c., Co., 3 P. F. Smith 224, said : " The sole object of such an order is to preserve the

subject of the controversy in the condition in which it is. when the order is made. It cannot be used to take property out of the possession of one party and put it into the possession of the other; that can be accomplished only by a final decree."

To the same point is Mammoth Vein Coal Company's Appeal, 4 P. F. Smith 183, in which the present Chief Justice said: "It ought not to be forgotten that a preliminary injunction is a restrictive or prohibitory process, designed to compel the party against whom it is granted to maintain his status merely until the matters in dispute shall by due process of the courts be determined." It is true that a mandatory order appears to have been made by Mr. Justice Lowrie, on a motion for a preliminary injunction before him in Allegheny county, in The Baptist Congregation v. Scannel, 3 Grant 48. It is enough to say of that case now, that the question does not appear to have been mooted or argued; at all events it is not adverted to in the opinion.

There are some few instances in England in which a mandatory order has been made on an interlocutory application; but they have been very extreme cases, and ought not to be followed as precedents. Thus in The Attorney-General v. The Metropolitan Board, 1 Hem. & Mil. 321, where the flue of a chimney had been stopped up by a plate put over it, so as to fill the house with smoke, the order was made so as to compel the defendant to remove it. In Hepburn v. Lardner, 2 Id. 345, damp jute was stored and dried on premises adjoining the plaintiff's premises, at the imminent risk of combustion.

These. and perhaps a few other cases of similar character rest on the authority of Lane v. Newdigate, 10 Ves. 193, in which Lord Eldon, in what he considered a clear and hard case, evidently felt that he was treading on dangerous ground, and therefore resorted to indirection to accomplish his purpose. The plaintiff was the assignee of a lease of mill property granted by the defendant, with covenants for the supply of water from canals and reservoirs on defendant's premises.

The allegation was that he had suffered the canal and reservoir to be out of repair, and especially had removed a certain stopgate. Lord Eldon expressed a difficulty whether it was according to the practice of the court to decree or order repairs to be done, but afterwards said: "So as to restoring the stop-gate the same difficulty occurs. The question is, whether the court can specifically order that to be restored. I think I can direct it in terms which will have that effect. The injunction I shall order will create the necessity of restoring the stop-gate, and attention will be had to the manner in which he is to use these locks; and he will find it difficult, I apprehend, to avoid completely repairing these works."

That is acknowledging that he could not, according to the prin-

[Audenried *v.* Phil. & Reading Railroad Co.]

ciples and practice of the court, order the defendant in direct terms to restore the stop-gate and repair the works : the injunction should be so drawn that, although on its face restrictive only, it will, in order to comply with it, compel him to do these very things. This is not a precedent which ought to be followed in this or any other court. A tribunal that finds itself unable directly to decree a thing, ought never to attempt to accomplish it by indirection. Injunction as a measure of mere temporary restraint is a mighty power to be wielded by one man. It would extend far beyond all safe and reasonable bounds to permit it to go farther.

The reason of the distinction in this respect between an interlocutory and final injunction is very obvious. The former may be granted on an *ex parte* application ; even when it is upon notice it is upon *ex parte* affidavits. The mode in which the testimony was taken in this case by an examiner was very unusual ; but it cannot change the character of the application. The proceedings, in the nature of things, must be summary. Besides, the effects of an interlocutory injunction may often be the same as a final decree, as, indeed, in this very instance.

The decree appealed from in this case was clearly mandatory. It followed closely Lane *v.* Newdigate, if it did not go beyond it. It commanded the defendants to allot, allow or continue to the plaintiffs such use of a wharf or wharves as are required by them, which shall be equal in quantity and convenience to the wharf accommodations furnished to any other person ; and that defendants refrain from allowing any other person to use any part of the wharves while they omit to furnish the plaintiffs with similar wharf facilities in a due proportion. We must take this decree, in connection with the undisputed fact that before the bill was filed the defendants had allotted all their wharves to others ; and it is very plain that they could not obey this decree without revoking this allotment and making a new one.

It is very true that it did not appear that any possession had been taken under the allotment at the time the bill was filed. It was upon paper merely. But that ought not to weigh in this case, because the several allottees under the allotment thus made were not made parties to the suit and have not been heard. Had they taken possession under their allotments it is not very easy to see how they could have been proceeded against for a contempt. Their equities may be as strong as the plaintiffs'. Beginners and small dealers have their rights as well as old and large ones. What contracts or arrangements for their business upon the faith of the allotment to them they had made we do not know. They were at least entitled to be heard.

Apart, however, from these considerations, we do not think that the facts disclosed by the depositions show so clear an equity

in the plaintiffs as would have entitled them to a restrictive injunction had they filed their bill before the allotment was made. It is not necessary to go further than this to prove that the preliminary injunction ought not to have been awarded. It is very doubtful whether the defendants, under their charter, are bound to provide any wharf accommodations for the coal-dealers at Port Richmond, and equally doubtful whether, having done so to a limited extent, not sufficient to supply the entire business, they are subject to any trust to use or dispose of that property in any particular way.

But concede both these points, what then? As trustees there is a discretion reposed in them in the use of the property with which a chancellor cannot interfere. It is agreed that they have not room enough for all. They must select some and reject others. Can a chancellor inquire into their motives, and not approving of them, assume the selection himself? The case of Dummer v. The Corporation of Chippenham, 14 Ves. 245, upon which the plaintiffs principally rely, does not support their assertion.

There the trustees of a charity school threatened to remove the master because he had voted contrary to their wishes in the election of a member of Parliament. The question was: Had the Chancellor jurisdiction to inquire into the matter and enjoin against such removal? It was upon demurrer to the bill. Had the master held his appointment for a term certain, which had expired or was about to expire, and the prayer had been to enjoin his reappointment, it would have had some analogy to this case.

Can any·one suppose that such a jurisdiction would have been assumed? It is not a matter which is open to dispute upon the depositions that the allotment of wharves by the defendants was annual—that the allotment made to the plaintiffs in 1869 had expired, and that there was no agreement to renew it. Changes appear to have been frequently made, although, as was natural, the allotments were generally renewed. It is agreed that the company might have put up these privileges every year and sold them to the highest bidder, as is somewhere done with the pews or seats in churches. They preferred to distribute them without premium or rent, in order that they might retain a more absolute control over the property.

It may well be, however, notwithstanding this, that an allottee turned out by the defendants, capriciously or from improper motives, during the year for which the allotment was made, might, on equitable grounds, be restored to the privilege for the rest of the year, or by an interlocutory injunction his removal, if threatened, prevented. But what right or equity has such an occupier superior to others, to hold over for another year? That would be to assure him a perpetual lease. If such a perpetual lease had been granted to one coal-dealer exclusively in all the wharves, it might well be

argued that Sandford *v.* Railroad Company, 12 Harris 378, would go far to sustain the position that such a grant was *extra vires.*

That case has no bearing upon this.   Transportation by a common carrier is necessarily open to the public upon equal and reasonable terms.   An exclusive right granted to one is inconsistent with the rights of all others.   This was not transportation, but wharfage, the nature of which requires exclusive possession temporarily.   The railroad company as trustees for the public have a necessary discretion in the management of such interests, and the motives of their proceedings cannot be reviewed by the courts.

It would be a dangerous and alarming power to be exercised by a chancellor over corporations or other trustees, to direct the appointment to offices, or awarding of contracts, whenever it appeared that it was about to be used from political or other improper motives.   This would be in effect to deprive the directors of corporations of their management, and to substitute the chancellor as supreme director or manager.   For this reason we think the decree in this case ought not to stand.

Decree reversed and record remitted.