TEBO ET AL.

*v.*

HAZEL ET AL.

(Court of Chancery of Delaware.   May 21, 1909.)

*Henry Ridgely, Jr.,* and *Frank M. Jones,* for complainants. *James H. Hughes* and *John B. Hutton,* for respondents.

THE CHANCELLOR: The motion for a preliminary injunction in this cause was argued Saturday, May 1st, by the solicitors for the respective parties on bill, answer, affidavits, and exhibits. Counsel asked for and obtained leave to file supplementary briefs on or before the following Saturday, and these have been duly presented, the brief of the respondents' solicitors on Friday, May 7th, and the brief in reply of the complainants' solicitors on Saturday, May 8th.

It appears from the bill and answer that William Saulsbury and William S. Haman, two of the complainants, are trustees of Wesley Church near Dover, and that George W. Tebo is a member of the congregation; that the respondents, William M. Hazel, James F. Wilds, Thomas J. Stevenson, Henry E. Moore, Wesley Webb, James H. Hughes, and William J. Benson, are the remaining trustees of said church, the said William M. Hazel being chairman of the board, and that the respondent, Mary C. Benson is the wife of the said William J. Benson. It also appears *inter alia* from the bill and answer, as admitted facts, that the said the Trustees of Wesley Church near Dover is a religious society or organization, forming a part of the Wilmington Conference, one of the annual conferences of the ecclesiastical organization known as the Methodist Episcopal Church in the United States of America. It further appears as an undisputed fact that a deed bearing date July 2, 1908, was executed by the aforesaid the Trustees of Wesley Church near Dover, by William M. Hazel, chairman of said board of trustees, and duly recorded March 20, 1909, which conveyed to the said William J. Benson in fee simple absolute the lot and church thereon being, and also the lot and parsonage, which belonged to the said religious society. On the same day, March 20, 1909, a deed of the said William J. Benson and Mary C. Benson, his wife, was also recorded, conveying the aforesaid lot and church and lot and parsonage to the said the Trustees of Wesley Church near Dover, in fee simple, and without any express trust or condition; the consideration or price mentioned in each of the said deeds being $100.

It is alleged in the bill that the complainants, William Saulsbury and William S. Haman, two of the trustees, were in entire ignorance of the execution of the said deeds until some time after the recording

of said deeds on March 20, 1909, and the answer alleges that, "if they had no knowledge of the said first-mentioned deed, it was because they did not attend the meeting of the trustees which authorized and directed the making and execution of it, after being duly notified so to do." The bill then alleges that the object or purpose for which the said deed to William J. Benson was made and executed as aforesaid was in order that the said William J. Benson might reconvey the property described in said deed, so that the said board of trustees might hold it free and discharged from any trust or condition, express or implied, contained in the deeds of Martha Allman and Martin W. Bates, by which title to the said property was originally obtained by the said Trustees of Wesley Church, and might devote said property to such uses as they should see fit, regardless of any trust or of any provision of the discipline of the Methodist Episcopal Church; that since the recording of said deed of William J. Benson to the trustees, the trustees who are named as respondents in the bill, professing to act as the board of trustees, have caused the church of said society to be closed and locked, and have refused to permit the minister, duly authorized and appointed under the rules and discipline of the Methodist Episcopal Church as the minister in charge of the congregation of said society, to hold religious services in the church aforesaid, and to reside in the parsonage belonging to the said society.

The bill further alleges that the aforesaid deed to William J. Benson and the act of the said William M. Hazel in making, executing, and delivering the same "were and are in violation of and contrary to the uses and trusts for which the property therein described was held by the religious society aforesaid, and were and are contrary to the discipline and rules of the Methodist Episcopal Church aforesaid." It further alleges that both of the above-described deeds constitute a cloud upon the title of the said society to the property in said deeds described, and prays for a decree setting aside and declaring to be null and void and of no effect the said deeds.

The bill further alleges "that Edmond L. Hoffecker is, and has been since the 22d day of March, 1909, a minister of the Methodist Episcopal Church, duly authorized and appointed to be the minister

in charge of the religious society aforesaid, in full accordance with the provisions of the discipline and rules of the Methodist Episcopal Church in the United States of America; that said appointment was made at the annual conference known as the Wilmington Conference, by the Bishop presiding over the same during the session thereof in the month of March, 1909; that under the discipline, rules, and usages of the Methodist Episcopal Church in the United States of America, under the trust contained in the aforesaid deeds of Martha Allman and Martin W. Bates, the said Edmond L. Hoffecker was and is entitled to use the church of the said religious society for the purpose of holding religious service therein, and to use the parsonage of said religious society for his residence during the term for which he was appointed as aforesaid, to wit, for and during the space of one year from the 22d day of March, 1909"—and the bill prays for an injunction to restrain the defendant trustees, William M. Hazel, James F. Wilds, Thomas J. Stevenson, Henry E. Moore, Wesley Webb, James H. Hughes, and William J. Benson, and their successors in office, from closing the said church and parsonage against the before-mentioned Edmond L. Hoffecker, and such other ministers as may be duly authorized to be the minister in charge, and further to restrain the said defendants and their successors in office from closing the church against the complainants and all other members of the congregation desiring to use the church as a place of worship, under and in accordance with the doctrine, discipline, and rules of the Methodist Episcopal Church, and also prays for a preliminary injunction, in like manner, until the further order of the Chancellor.

At the hearing of the rule, however, complainants' counsel asked for a preliminary injunction, mandatory in effect, that would compel the said defendants, the said trustees respondent, and their successors in office as members of the board of trustees, to open the church and parsonage to the before-mentioned Edmond L. Hoffecker, and such other ministers duly authorized and appointed under the discipline and rules of the Methodist Episcopal Church in the United States of America to be the minister in charge of said society during the terms for which the said Edmond L. Hoffecker and such other ministers as aforesaid shall be appointed as aforesaid.

A number of affidavits were also read by the complainants' counsel in support of the bill. One by Rev. David H. Moore, a Bishop of the Methodist Episcopal Church in the United States of America, and the Bishop in charge of the said Wilmington Conference since the month of May, 1908, to the effect that every minister or preacher appointed to take charge of any local Methodist Episcopal Church by the Bishop having jurisdiction at the time over the annual conferences within the territorial boundaries of which such local church is situated, is the only rightful and lawful pastor of such local church, and has the right and authority to hold religious services in the said local church, and to reside in the parsonage; that although in many instances local churches or congregations expressed their preference by way of invitation or otherwise, for some particular minister, such preference is subject to the confirmation by the Bishop presiding over the conference, and unless such minister be appointed by such Bishop, he can have no right or authority to be the pastor of any local church or congregation; that the vesting in the Bishops of the exclusive authority to appoint ministers or preachers to take charge of local churches is now, and has ever since its organization been, one of the distinguishing principles in the Methodist Episcopal Church in the United States of America. The affidavits of Rev. Stephen M. Morgan, District Superintendent of the district known as Dover District of the Wilmington Conference, of Rev. Alpheus S. Mowbray, District Superintendent of the district known as the Wilmington District of the Wilmington Conference, of Rev. Robert K. Stephenson, District Superintendent of the district known as the Easton District of the Wilmington Conference, and of Rev. George P. Jones, District Superintendent of the district known as the Salisbury District of the Wilmington Conference, are to the same effect. The affidavits of Thomas C. Roe and Edward Haman are to the effect that during the long period of their membership both the temporal and spiritual affairs of the said local church and religious society were conducted under and subject to the doctrine, discipline, rules, regulations, and usages of the Methodist Episcopal Church in the United States of America, and the ministers appointed from time to time to such charge by the Bishop had always been accepted.

The official publication containing the rules and discipline of the Methodist Episcopal Church in the United States was also put in evidence.

The answer denying some paragraphs in whole or in part, and admitting others in whole or in part, alleges *inter alia,* as matter of defense, that the Trustees of Wesley Church near Dover, by virtue of the terms of the original certificate of incorporation, certified and recorded in 1799, under the provisions of an act passed February 3, 1787 (Laws 1700-1797, p. 878, c. 144), entitled, "An act to enable all the religious denominations in this state to appoint trustees who shall be a body corporate for the purpose of taking care of the temporalities of their respective congregations," and also by the terms of the deeds of Martha Allman and Martin W. Bates, by which the said trustees obtained title, as aforesaid, to the church lot and the parsonage lot, respectively, had such control of the temporalities of the church and the church property as to empower them to make the said deed to William J. Benson.

The last paragraph of paragraph 11 of the answer states the claim of the respondent in that respect as follows: "That according to the laws of the state of Delaware under which the said the Trustees of Wesley Church near Dover, Kent county and state of Delaware, was incorporated, the trustees of such society or congregation have the power without any limitation, and without obtaining the consent or order of any officer or conference to give, grant, and demise, assign, sell, transfer, and dispose of all or any of their messuages, houses, lands, tenements, rents, and other hereditaments, and also goods and chattels aforesaid, as to them shall seem meet for the use and benefit of the society or congregation to which they shall respectively belong."

Paragraph 8 contains the following allegation: "That from and continuously since the purchase of the lot hereinbefore referred to and the erection of a church thereon, the Board of Trustees, the Official Board, or the Quarterly Conference, of Wesley Church near Dover, Kent county and state of Delaware, have always selected the ministers for the said society and the congregation thereof, and have

designated to the respective Bishops presiding over the Annual Conferences such choice. Said Bishops have always recognized the said selections of ministers, and designated the persons so selected by said Trustees, Official Board, or Quarterly Conference to be ministers in charge of said society and the congregation thereof. That such ministers have always been permitted by the said board of trustees to reside in the parsonage owned by the said corporation as hereinbefore set forth up to and until the date mentioned in the said eighth section of the complainants' bill of complaint. That previous to the said date, during the meeting of the Annual Conference known as the Wilmington Conference, the Bishop presiding at such conference was duly notified by the said trustees of the said corporation that under existing circumstances the said trustees did not desire to have a minister of the said conference assigned, appointed or named for their church. That the appointment of Edmond L. Hoffecker to be minister of the said church was made against the wishes and desires of the said trustees and a large majority of the members and congregation of the said church."

They further allege in paragraph 17 that at the usual times religious services are and have been held in said church, to wit, prayer meeting, Sunday school, and other services other than preaching services.

The questions put in issue by the bill and answer were discussed at length by the solicitors for the complainants at the hearing of the motion for a preliminary injunction, and their contention is fully stated in the beginning of their brief as follows: "The question raised in this case is one of property rights pure and simple. The complaint is that certain of the defendants professing to act as a board of trustees of the defendant society have diverted the property of said society from the uses and purposes for which it was held. The complainants ask the protection of this court for those rights which they and all other persons as members of said society have in the use and enjoyment of said property. This is no case of a dispute as to ecclesiastical offices or spiritual functions unconnected with civil or temporal rights, as in *Union Church v. Sanders*, 1 *Houst.* 100 [63 *Am. Dec.* 187], and *Christ Church v. Phillips*, 5 *Del.Ch.* 429. In the present

cause the ecclesiastical law is of importance simply because it explains and illuminates the origin of the defendant society, the purpose of its formation, the object for which this property was acquired, and the intent of all persons associating themselves with it as members thereof. * * * The diversion of the property complained of consists (1) in the conveyance to William J. Benson, and (2) in the refusal to permit the complainants and other members of the defendant society from using the church for purposes of religious worship under the pastorate of Rev. Edmond L. Hoffecker, as also the refusal to permit said Hoffecker to assume the duties of pastor by preaching in said church and residing in the parsonage."

The solicitors for the respondent, on the other hand, after briefly stating their grounds of defense to the bill, as set forth in the answer, addressed their argument chiefly to the question whether the preliminary injunction asked for by the complainants at the hearing was such an injunction as could be granted by the chancellor by an order made pendente lite, in accordance with the established rules of a court of equity. Or, in other words, whether it is within the power of the Chancellor in this state to grant, on motion, an order for an injunction, mandatory in its character, an injunction which alters pendente lite the status quo of the parties at the beginning of the suit. There is, of course, no doubt of the power of the Court of Chancery to grant in a final decree all the relief prayed for by the bill, or asked for by counsel, and a great number of cases have been cited in the briefs in which courts of equity have decided somewhat similar cases after final hearing of the suit, and have settled by final decree the question of the possession, or right of control over church property, in cases where trustees or members of a local church or religious society have claimed the right to possession or control against other members or trustees or a pastor representing, or claiming to represent, the authority of the general religious denomination or organization whose name was borne by the local religious society. The question, however, whether the Chancellor of Delaware has the power to grant a preliminary injunction, mandatory in character, and in this summary fashion on motion to alter the position of the parties to a suit in respect to its subject-matter, requires most careful con-

sideration, and is one of supreme importance to the citizens of this state, a question no less important than are those which go to the merits of this suit.

The books are full of discussions of the limitation of the power of courts of equity in the granting of preliminary injunctions; and, in view of the absence of any discussion of this subject in our own reports since 1816, during the term of Chancellor Ridgely, as well as on account of its supreme importance, it seems not undesirable that I should, in the progress of a cause of such public interest as the present one, take occasion to review some of the principal authorities upon this question, and ascertain what is the nature of the limitation of the power of this court in the exercise of its jurisdiction in the ordering of preliminary injunctions, a power which is often called the strong arm of the Court of Chancery.

As the Chancellor remarked in *Equitable Guarantee & Trust Co. v. Donahoe,* 8 *Del.Ch.* 422, 433, 45 *Atl.* 583: "The English and American equitable jurisprudence is a unique system; a complex interweaving of principle and precedent, of reason and experience. It has progressed by slow and careful steps, guided always by careful observation of the practical consequences of what had been done already. And in no department has the adherence to precedent been more marked, in no sphere of action does it behoove the equity judge to be more careful 'to keep within the ancient merestones,' than when there is question of wielding the tremendous power of the injunction process."

In the Court of Chancery of Delaware there is no record of the application for, much less the granting of, an order for a preliminary injunction, mandatory in its character, since a decision rendered by the Court of Errors and Appeals in 1816, above referred to, in the case of *Tatem et al. v. Gilpin et al.,* 1 *Del.Ch.* 14, which was always considered by our older equity lawyers to have been the authoritative settlement of this question in the state. In that case an appeal from the Chancellor was sustained on an order for an injunction considered mandatory in its effect, and its mandatory features were stricken out by the Court of Errors and Appeals. The appel-

late tribunal, the highest court in the state, at the same time construed that provision of the Constitution which provided that an appeal would lie "from interlocutory or final orders or decrees of the Chancellor," and held "(1) that the words 'interlocutory orders or decrees' in the Constitution must be taken in the technical sense, and that the right of appeal is not enlarged, but secured, by the Constitution; (2) that an order for an injunction pendente lite cannot be appealed from, if it be such an order for an injunction as a court of equity, according to its established rules, can issue." The Chancellor had based his order for such preliminary injunction upon the case of *Robinson v. Lord Byron,* 1 *Bro.Ch.* 588, a case which is commented upon and discriminated in a number of the cases cited in the pending cause, but our Court of Errors and Appeals held, nevertheless, that the order appealed from was "an order of such nature that it is not to be considered simply an order for process of injunction, but is such an act of the court below as would entitle the appellant to relief by appeal to this court." The court then ordered that the order made by the Chancellor for a preliminary injunction be modified, and directed that a writ of injunction be issued by the Court of Chancery which should not contain the portion that was considered to be in effect mandatory. Those distinguished lawyers, McLane and Van Dyke, were of counsel in the cause, and in the course of their argument before the Court of Errors and Appeals defined a preliminary injunction, according to the established rules of equity, as follows: "It decides no fact, fixes no right, and it is not at all necessary to final determination of the case. It is mere process of the court, issued to hold in statu quo the subject-matter upon which the decree is to operate, until the court should be enabled to ascertain and adjudicate the rights of the parties."

And it may be observed, that an exhaustive examination of our reports since that date will disclose the fact that every preliminary injunction issued since that time has been in accordance with the terms of that definition. No Chancellor has attempted to step beyond the limits laid down. In the case of *Bubenzer v. P.B. & W.R.R. Co.,* (*Ch.*) 57 *Atl.* 242, it was decided by the Chancellor, after hearing full argument on the form of an order for a preliminary injunc-

tion (this argument and ruling not being as yet officially reported), that in accordance with the ruling of the Court of Errors and Appeals in the case of *Tatum et al. v. Gilpin et al., supra,* no statement of any finding of fact or law could properly be inserted in an order for a preliminary injunction. At the same time it has frequently happened that the Chancellor, upon the decision of a motion for a preliminary injunction, would give his reasons at length in any case where the decision of the motion involved the consideration of the same questions that would arise at a final hearing, but this is done merely for the convenience and guidance of counsel, to enable them to determine whether they would be justified in proceeding to contest vigorously the issues involved, up to a final decree, and when the correctness of such opinion has not been questioned in any subsequent proceeding in the cause, it possesses an authority on the points of law discussed as if rendered at a final hearing.

In *Rogers Locomotive Works v. Erie Railway Co.,* 20 *N.J.Eq.* 379, decided in 1869, Chancellor Zabriskie reviews at length the principle laid down upon this subject by the older authoritative treatises, beginning as follows: "It is contended by the defendants that a mandatory injunction, or one which commands the defendant to do some positive act, will not be ordered, except upon final hearing, and then only to execute the decree or judgment of the court, and never on a preliminary or interlocutory motion. Or that, if it ever does so issue, it is only in cases of obstruction to easements or rights of like nature, in which a structure erected and kept as the means of preventing such enjoyment will be ordered to be removed, as part of the means of restraining the defendant from interrupting the enjoyment of the right. Although there is some conflict in the authorities and decisions, I am of opinion after examining into them, that this position with the limitation, is the established doctrine of the courts of equity, and that it is a proper and discreet limitation of the use of the preliminary injunction, as well as sustained by the weight of authority. Justice Story, in 2 Eq. Jur. § 861, says: 'A writ of injunction may be described to be a judicial process whereby a party is required to do a particular thing, or to refrain from doing a particular thing, according to the exigency of the writ. The most com-

mon form of injunction is that which operates as a restraint upon the party in the exercise of the real or supposed rights, and is sometimes called the remedial writ of injunction. The other form, commanding an act to be done, is sometimes called the judicial writ, because it issues after a decree, and is in the nature of an execution to enforce the same.' Mr. Eden begins his treatise on Injunctions by saying: 'An injunction is a writ issuing by the order and under the seal of a court of equity, and is of two kinds. The one is the writ remedial; for, in the endless variety of cases in which a plaintiff is entitled to equitable relief, if that relief consists in restraining the commission or continuance of some act of the defendant, a court of equity administers it by means of the writ of injunction. The other species of injunction is called the judicial writ, and issues subsequent to a decree, and is properly described as being in the nature of an execution.' In Drewry on Injunction, p. 260, it is laid down: 'It seems settled that equity has not jurisdiction to compel, on motion, the performance of any substantive act.' In 3 Dan. Chan. Prac. 1767, it is said: 'It is to be observed that the court will not, by injunction granted upon interlocutory application, direct the defendant to perform an act, but might, upon motion, order the defendant to pull down a building which was clearly a nuisance to the plaintiff.' "

The Chancellor then proceeds to review some of the cases, as follows: "Lord Hardwicke, in an anonymous case in 1 Ves. Jun. 140, restrained the further digging of a ditch, but refused, on motion before answer, to order the part dug to be filled up. Chancellor Vroom, in *Atty. Gen. v. New Jersey Railroad Co., 2 Green's C.R.* [3 *N.J.Eq.*] 141, says: 'The injunction is a preventive remedy. It interposes between the complainant and the injury he fears or seeks to avoid. If the injury be already done, the writ can have no operation; for it cannot be applied correctively, so as to remove it.' In that case the injury done was driving piles for a bridge, so as to obstruct navigation; a mandatory injunction to remove them would have remedied the whole evil. In *Hooper v. Broderick*, 11 *Sim.* 47, a preliminary injunction to restrain a tenant from discontinuing to keep an inn was dissolved on the ground that it was mandatory—the same as if he was commanded to keep an inn."

In like manner he reviews and digests the following English cases: *Blakeman v. Glamorganshire Canal Navigation Co.,* 1 *Myl. & Keene* 154; *East India Co. v. Vincent,* 2 *Atk.* 83; *Spencer v. London & Birmingham Railway Co.,* 8 *Sim.* 198; *Durell v. Pritchard,* 1 *Ch.Ap.* (*E.L.R.*) 244; *Robinson v. Lord Byron,* 1 *Bro. C.C.* 588; *Lane v. Newdigate,* 10 *Ves.* 192; *Ranken v. Huskisson,* 4 *Sim.* 12; *Mexborough v. Bower,* 1 *Beav.* 127; *North of England Railway Co. v. The Clarence Railway Co.,* 1 *Coll.* 507; *Greatrex v. Greatrex,* 1 *De Gex & Sim.* 692; *Heracy v. Smith,* 1 *Kay & J.* 389.

I have quoted at length from this opinion as, perhaps, the leading American case upon the subject, and one which has been recognized in New Jersey as the ruling one, and it has invariably been sustained by the New Jersey Court of Errors and Appeals, which, it may be noted, has not infrequently deemed it necessary to reverse Chancellors and Vice Chancellors who seemed disposed to exceed the correct limits of their jurisdiction in the matter of preliminary injunctions. See, amongst other cases, *Bailey v. Schnitzius,* 45 *N.J.Eq.* 178, 13 *Atl.* 247, 16 *Atl.* 680, where the appellate court reversed an order for a preliminary injunction, mandatory in effect, which had been granted by Vice Chancellor Bird, although it conceded the right of the Court of Chancery to grant a mandatory preliminary injunction in certain cases, remarking that "a preliminary mandatory injunction will be ordered only in cases of extreme necessity." Expressions to this effect may be found in a number of modern cases which grant preliminary injunctions mandatory in effect, in cases which the court deem of extreme necessity, and in which the right appears perfectly plain, and also in cases denying such motions, as in the case of *Grand Castle G.E. v. Bridgeton Castle No. 13, K.G.E.* (*N.J.Ch.*) 40 *Atl.* 849, 850, where Vice Chancellor Grey, denying the motion for a preliminary mandatory injunction, says: "Mandatory injunctions ought not to be granted until final order, unless the situation indicates an absolute necessity for their use in the preservation of the rights of the parties." Also see *West Side Electric Co. v. Consolidated Telegraph & Electrical Subway Co.,* 87 *App. Div.* 550, 84 *N.Y. Supp.* 1053, where the New York Supreme Court, Appellate Division, ordered mandatory features of a prelim-

inary injunction, or injunction pendente lite, from which an appeal was taken, to be stricken out, with the comment: "The court will seldom grant a mandatory injunction pendente lite, unless the plaintiff's right is so clear that the denial of the right must be either captious or unconscionable."

There is one other case, from the opinion in which I will quote at length, on account of Judge Sharswood's exhaustive review of the leading authorities, and the clearness with which he states the distinction in principle between the interlocutory or preliminary injunction and the injunction on final decree. The case is *Audenrief v. Phila. & Reading Railway Co.,* 68 *Pa.* 370, 8 *Am. Rep.* 195. Judge Sharswood says:

"All injunctions are generally processes of mere restraint; yet final injunctions may certainly go beyond this, and command acts to be done or undone. They are then termed 'mandatory.' They are often necessary to complete justice. But the authorities, both in England and this country, are very clear that an interlocutory or preliminary injunction cannot be mandatory. In *Gale v. Abbott,* 8 *Jurist, N.S.* 987, Vice Chancellor Kindersley said: 'It was useless to come for what was called a mandatory injunction on an interlocutory application. Such an application was one of the rarest cases that occurred, for the court would not compel a man to do so serious a thing as to undo what he had done, except at the hearing.' So in *Child v. Douglass, Kay,* 578, Vice Chancellor Sir W. Page Wood, now Lord Chancellor Hatherley, noticed the same distinction: 'The plaintiff has a right to an injunction to restrain the building of the wall until further order, but I can make no order on an interlocutory application as to that part of the motion which relates to pulling down what has already been built.'

"It was said by Chancellor Bland, in *Murdock's Case, 2 Bland* [*Md.*] 469 [20 *Am. Dec.* 381] : 'To restrain a defendant from making any abusive use of the property in question, or from disposing of it past recall, amounts to no more than the imposition of a temporary limitation upon the free exercise of his right, even if it should eventually appear to be entirely and rightfully his'—which is quite as

far as any court can go in the first instance, and as preparatory to a fair beneficial hearing and final adjudication. It was held accordingly in *Washington University v. Green,* 1 *Md.Ch.* 97, that an injunction, unless issued after the final decree, when it becomes a judicial process, can only be used for the purpose of prevention and protection, and not for the purpose of commanding the defendant to undo anything which he had previously done. To the same effect are *New York Printing and Dyeing Establishment v. Fitch,* 1 *Paige* [*N.Y.*] 97; *Bosley v. Susquehanna Canal,* 3 *Bland* [*Md.*] 65; *Attorney General v. New Jersey Railroad Co.,* 2 *H. W. Green's Ch. R.* [*3 N.J.Eq.*] 186; *Attorney General v. City of Paterson,* 1 *Stockton* [*9 N.J.Eq.*] 624. This distinction between a preliminary and final injunction is fully recognized in our own decisions.

"Mr. Justice Strong states it in his opinion at nisi prius, in *Lehigh Coal and Navigation Co. v. Lehigh Valley Railroad Co.,* January, 1855, No. 59, April 5, 1855, in which he says: 'A preliminary injunction ought never to be granted except in a clear case, and then only to prevent a substantial injury. Its purpose is to keep things in their existing condition until the case can be finally heard. As it is the strong arm of the law, it must be used only when necessity requires it. And a preliminary injunction can never be necessary when the thing sought to be restrained has been already done; for its province is not to undo, but to prevent and preserve.' The same learned judge, delivering the opinion of the whole court in *Farmers' Railroad Co. v. Reno, etc., Co.,* 3 *P. F. Smith* [53 *Pa.*] 224, said: 'The sole object of such an order is to preserve the subject of the controversy in the condition in which it is when the order is made. It cannot be used to take property out of the possession of one party and put it into the possession of the other; that can be accomplished only by a final decree.' To the same point is *Mammoth Vein Coal Company's Appeal,* 4 *P. F. Smith* [54 *Pa.*] 183, in which the present Chief Justice said: 'It ought not to be forgotten that a preliminary injunction is a restrictive and prohibitory process, designed to compel the party against whom it is granted to maintain his status merely until the matters in dispute shall by due process of the courts be determined.' It is true that a mandatory order appears to have

been made by Mr. Justice Lowrie, on a motion for a preliminary injunction before him in Allegheny county, in *Baptist Congregation v. Scannel,* 3 *Grant* [*Cas.*] 48. It is enough to say of that case now that the question does not appear to have been mooted or argued; at all events it is not adverted to in the opinion.

"There are some few instances in England in which a mandatory order has been made on an interlocutory application; but they have been very extreme cases, and ought not to be followed as precedents. Thus in *Attorney General. v. Metropolitan Board,* 1 *Hem. & Mil.* 321, where the flue of a chimney had been stopped up by a plate put over it, so as to fill the house with smoke, the order was made so as to compel the defendant to remove it. In *Hepburn v. Lardner,* 2 *Hem. & Mil.* 345, damp jute was stored and dried on premises adjoining the plaintiff's premises at the imminent risk of combustion. These and perhaps a few other cases of similar character rest on the authority of *Lane v. Newdigate,* 10 *Ves.* 193, in which Lord Eldon, in what he considered a clear and hard case, evidently felt that he was treading on dangerous ground, and therefore resorted to indirection to accomplish his purpose. The plaintiff was the assignee of a lease of mill property granted by the defendant, with covenants for the supply of water from canals and reservoirs on defendant's premises. The allegation was that he had suffered the canal and reservoir to be out of repair, and especially had removed a certain stopgate. Lord Eldon expressed a difficulty whether it was according to the practice of the court to decree or order repairs to be done, but afterwards said: 'So as to restoring the stopgate the same difficulty occurs. The question is whether the court can specifically order that to be restored. I think I can direct it in terms which will have that effect. The injunction I shall order will create the necessity of restoring the stopgate, and attention will be had to the manner in which he is to use these locks; and he will find it difficult, I apprehend, to avoid completely repairing these works.' That is acknowledging that he could not, according to the principles and practice of the court, order the defendant in direct terms to restore the stopgate and repair the works. The injunction should be so drawn that, although on its face restrictive only, it will, in order to comply with it, compel him to do

these very things. This is not a precedent which ought to be followed in this or any other court. A tribunal that finds itself unable directly to decree a thing ought never to attempt to accomplish it by indirection. Injunction as a measure of mere temporary restraint is a mighty power to be wielded by one man. It would extend far beyond all safe and reasonable bounds to permit it to go farther." *Audenried v. Phil. & Reading Railroad Co.*, 68 *Pa.* 370, 375-378, 8 *Am. Rep.* 195.

In *McCauley v. Kellogg et al.*, 15 *Fed. Cas.* 1261, 1264 (No. 8,688), Woods, United States Circuit Judge, on denying a motion for a preliminary injunction because mandatory in effect, cited no other authorities than the two above from which I have quoted so extensively, and based his decision upon them in the following terms: "In *Rogers Locomotive Works v. Erie Railway Co.*, 20 *N.J.Eq.* 379, the court, after a learned review of all the cases, both English and American, bearing upon the subject, announced the conclusion that a mandatory injunction will not be ordered upon a preliminary or interlocutory motion, but only upon final hearing, and then only to execute the decree or judgment of the court. It is only in cases of obstruction to easements, or rights of like nature, that maintaining a structure as a means of preventing their enjoyment will be restrained and the structure ordered to be removed as part of the means of restraining the defendant from interrupting the enjoyment of the right. To the same effect is the case of *Audenried v. Philadelphia & Reading R. Co.*, 68 *Pa.* 370 [8 *Am. Rep.* 195]. It is clear to my mind that the injunction asked for falls within the category of mandatory injunctions, and cannot therefore be granted on motion."

The one solitary case which has been cited by the learned counsel for the complainant which sustains their contention that a court of equity has the power, in accordance with the general rules of equity procedure, to grant such an injunction as they desire in the pending cause is referred to on page 7 of their supplementary brief in the following language: "The case of *Whitecar et al. v. Michenor et al.*, 87 *N.J.Eq.* 6, seems to us on all fours with the case under consideration. The Chancellor considered there that a preliminary injunction was manifestly proper. We have found no decision to the contrary.

That we have only this one case on this particular point is readily accounted for because the cases examined were reported in decisions of the appellate courts, where of course the question of the awarding of a preliminary injunction could not arise. The one case we have cited, however, coming from such a respectable source, seems to us to be convincing." Now, in regard to the statement thus made by complainants' counsel that questions of the awarding of a preliminary injunction could not arise in the appellate courts, the fact is quite otherwise; for there are many jurisdictions outside of Delaware in which an appeal will lie from orders granting, denying, or dissolving preliminary injunctions, and the rule existing in this respect in every jurisdiction in the United States may be found, with citations of the authorities, conveniently collected in a long note on pages 598 and 599 of 2 Cyc. It may be especially noted that in New Jersey, with the exception of the case of *Rogers Locomotive Works v. Erie Railway Co., supra,* the most instructive of the cases cited by counsel in the argument before me have been of the highest appellate court in New Jersey, the Court of Errors and Appeals, sustaining or reversing orders made by the Chancellor granting preliminary injunctions.

The rule governing this class of appeals in the federal courts is stated by United States Circuit Judge Woods in *Andrews v. National Foundry and Pipe Co.,* 61 *Fed.* 782, 789, 10 *C.C.A.* 60, which reversed a preliminary injunction because of its mandatory effect, as follows : "The objection is made that the statute authorizes an appeal only from an 'interlocutory order' of injunction granted 'upon a hearing in equity'; that the order in this case was a preliminary one, made upon a prima facie showing, and is not appealable, but we concur in the opinion of the Court of Appeals for the First Circuit that the statute was intended to extend the right of appeal 'to all that class of interlocutory orders or decrees (of injunction) which interfere with the possession of property or operate in the restraint of trade.' *Richmond v. Atwood,* 5 *U.S. App.* 151, and 52 *Fed.* 10, 2 *C.C.A.* 596 [17 *L.R.A.* 615]. The order granting an injunction should be set aside, and it is so ordered."

The rule in New Jersey is laid down by the Chief Justice, delivering the opinion of the Court of Errors and Appeals in *Morgan v.*

*Rose,* 22 *N.J.Eq.* 583, 593, as follows: "We consider the general rule, settled by the practice and recognized in the decisions, is that all orders either granting, refusing, sustaining, or dissolving injunctions are appealable, unless in those few and exceptional cases where an order is so temporary in its operation, or so slightly affects the interest of the party on whom it operates, that such party cannot be said to be aggrieved by such order." This case of *Morgan v. Rose* is cited by the complainants' counsel, and very much relied upon by them in support of their contention. The complainants were members of the Baptist Church of Camden, one of them at the time the bill was filed being the pastor, and four of the other trustees, of the church. Five of the defendants claimed to be trustees, and the rest were members of the congregation. As in the pending cause and in *Whitecar v. Michenor,* upon which, as we have seen, complainants' counsel chiefly rely, the church had been closed to the pastor claiming the right to the charge, but afterwards the pastor and his friends, the other complainants, obtained possession of the building, caused it to be thrown open to the congregation, and then filed a bill of complaint and moved for a preliminary injunction in order to prevent the defendants from again closing the church. The position of the parties thereof was precisely the reverse of that of the parties in the pending cause. A preliminary injunction was granted in order to preserve the status quo existing at the time the bill was filed, and an appeal was taken to bring up for review by the Court of Errors and Appeals the action of the Chancellor in granting it. The Chancellor was very properly sustained, and the order for a preliminary injunction appealed from affirmed with costs.

In *Whitecar v. Michenor,* 37 *N.J.Eq.* 6, the complainants were Rev. Dr. Charles H. Whitecar, a minister of the Methodist Episcopal denomination who had been appointed to the charge over the Methodist Episcopal Church, and certain members of his congregation. The defendants were the trustees of the church. As in *Morgan v. Rose,* the defendants in this case had closed the church against the complainant, claiming to be its duly appointed pastor, and it still remained closed against the complainants at the beginning of the suit. The Chancellor said (page 13 of 37 *N.J.Eq.*) : "On the filing

of the bill an injunction was granted, but it was not mandatory in its character. It indicated that in the judgment of the court, on the case made by the bill, the defendants ought to be restrained from closing the church building against the preacher and the congregation. It did not, however, require them to open it, and they refused to open it under the non-mandatory prohibition. Their refusal was not a violation of the command of the writ, and the application for an attachment against them for contempt was therefore properly denied. The present application was subsequently made to me for a mandatory injunction. I thereupon granted an order to show cause why an injunction should not be granted, and the defendants then put in their answer. The whole case is now before me, and the defendants have been heard upon the application." The order for a mandatory injunction was then granted in place of the futile writ already issued, which first order would, of course, have been a proper one under the ruling of the Court of Errors and Appeals in *Morgan v. Rose, supra,* had the complainants been in possession and opened the church before the filing of the bill, but upon the existing facts it was plainly unadvised. Possibly, however, the actual position of the parties in relation to the church property had not been correctly stated in the bill or brought to the attention of the Chancellor. The mandatory preliminary injunction granted at this stage of the proceedings was not appealed from, so that it is impossible to say whether the Court of Errors and Appeals would have reversed the order if the defendants had not acquiesced by permitting the proceedings to drop.

In the pending cause the prayer for preliminary injunction and the rule to show cause upon it, as stated above in my review of the pleadings, is for a preliminary injunction without mandatory features, as was the first preliminary injunction issued in *Whitecar v. Michenor,* which could very properly be granted had the complainants been in possession, and had the church open at the beginning of the suit, as was the case in *Morgan v. Rose, supra.* I need hardly say that this court could not grant such an order, under existing conditions, for the reason that, like the similar order in the case of *Whitecar v. Michenor, supra,* it would be entirely futile, and the Court of Chancery will not issue futile orders prohibiting the doing of that

which has been already done. As a matter of fact, however, complainants' counsel in their argument and supplementary brief practically abandon the application for such an order, and boldly ask for a preliminary injunction with mandatory features, under the rule already issued, so far as the church itself is concerned; but, after discussing in their supplementary brief the objection made by counsel for the respondents that a mandatory writ would work a change of possession before the determination of the suit, in both church and parsonage, they apparently modify their claim as to the parsonage in the following words, to wit: "If that be debatable, however (that it would transfer the possession of the parsonage) at least, the issuance of the writ restricted to the church building would not, we think, be justly held to work any change in possession of that portion of the property of the defendant society." It seems unnecessary to make any comments upon this statement, for the effect of a mandatory injunction upon the position of the parties in the pending cause in relation to both church and parsonage is too obvious to require any discussion. The condensed statement already made of the facts presented by the pleadings and affidavits make this sufficiently clear. Nor does it seem necessary in view of the foregoing to take up other and less important points, or to prolong this opinion to an excessive length by further discussion of authorities. Those I have reviewed sufficiently illustrate the principles which control courts of equity in all well-considered cases, in other jurisdictions, in their treatment of applications for a preliminary or interlocutory injunction mandatory in effect.

In our own state the rule was long ago laid down, as we have seen, by our highest court in *Tatem et al. v. Gilpin et al., supra,* and until that case be modified or reversed by our Supreme Court, the Court of Chancery is bound by it. If, indeed, a case should ever be presented to the Court of Chancery of Delaware containing features and circumstances of such extreme and urgent danger or mischief as in some of the cases above reviewed, as have led many courts to make an exception to the rule and grant an injunction mandatory in effect pendente lite, then, if the Chancellor should desire to give the Supreme Court an opportunity to review the whole question, be-

lieving that he was warranted in so doing by the nature of the case, he might grant such preliminary injunction for the express purpose of obtaining a review of the whole question in the light of modern conditions and authorities. It is true that the action of the order would in that event be suspended during the pendency of the suit, so that a decree upon final hearing could probably be made before a decision by the Supreme Court of the appeal from the preliminary injunction. See *Tatem et al. v. Gilpin et al., supra* [1 *Del.Ch.*] p. 19, where Chancellor Ridgely denied the motion for an attachment for disobedience of his mandatory injunction, as follows: "As the appeal has been allowed, the case is out of this court, and now I cannot proceed in the cause in any manner until it returns from the High Court of Errors and Appeals." Therefore no advantage would probably accrue to the complainant in the particular case, but the result would be an authoritative review of the whole subject by our highest court, after an interval of nearly a hundred years from its last utterance upon the question. In view of the considerations I have adduced, however, and the authorities reviewed, it seems too plain for argument that such a case is not presented by the pending cause, and it is simply obvious that the mandatory injunction asked for at the hearing is beyond the power of the Chancellor of Delaware as now defined by its highest appellate court.

It only remains for me to say in conclusion that the issues presented to this court by the pleadings in the cause before me, grave and important as they are, may be fully determined, as already stated, by a decree after final hearing, but the painful and distressing character of the situation disclosed at the hearing is to be found in matters beyond the reach of any secular tribunal. One of the great historical churches of Delaware that for a century has been a center of beneficence and a source of religious inspiration is torn by dissensions, so that its widespread influence for good is weakened and a cloud cast upon its future. It is the function of ecclesiastical tribunals to search for the causes of such unhappy conditions, and, if possible, remove them. This court can only act within the limits prescribed by the Constitution and laws of Delaware, and however desirable it might be to hasten the determination of the controversy with regard

to the property of the church or religious society, it is plainly beyond the power of this court to decide it at this time and in these proceedings.

The motion for a preliminary injunction is denied and the rule discharged.

Let an order be entered accordingly.