# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| C&J ENERGY SERVICES, INC., JOSHUA E. COMSTOCK, RANDALL C. McMULLEN, DARREN M. FRIEDMAN, ADRIANNA MA, MICHAEL ROEMER, C. JAMES STEWART, III, H.H. "TRIPP" WOMMACK, III, NABORS INDUSTRIES LTD., and NABORS RED LION LIMITED, | § § § § § § § § § § | No. 655/657, 2014 Court Below: Court of Chancery of the State of Delaware, C.A. No. 9980-VCN |
|     Defendants Below,     Appellants, | § § § | |
| v. | § § | |
| CITY OF MIAMI GENERAL EMPLOYEES' AND SANITATION EMPLOYEES' RETIREMENT TRUST, on behalf of itself and on behalf of all others similarly situated, | § § § § § § § | |
|     Plaintiff Below,     Appellee. | § § | |

Submitted: December 17, 2014
Decided: December 19, 2014

Before **STRINE**; Chief Justice; **HOLLAND**, **RIDGELY**, **VALIHURA**, and **VAUGHN**, Justices, constituting the Court *en Banc.*

Upon appeal from the Court of Chancery. **REVERSED**.

Stephen C. Norman, Esquire, Michael A. Pittenger, Esquire, Jaclyn C. Levy, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware; Michael C. Holmes, Esquire (*argued*), Elizabeth C. Brandon, Esquire, Vinson & Elkins LLP, Dallas, Texas, Attorneys for Appellants C&J Energy Services, Inc., Joshua E.

Comstock, Randall C. McMullen, Darren M. Friedman, Adrianna Ma, Michael Roemer, C. James Stewart, III, and H.H. "Tripp" Wommack, III.

William M. Lafferty, Esquire, Leslie A. Polizoti, Esquire, Eric S. Klinger-Wilensky, Esquire, Lindsay M. Kwoka, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Alan J. Stone, Esquire (*argued*), Hailey DeKraker, Esquire, Milbank, Tweed, Hadley & McCloy LLP, New York, New York, for Appellants Nabors Industries Ltd. and Nabors Red Lion Limited.

Stuart M. Grant, Esquire, James J. Sabella, Esquire, Mary S. Thomas, Esquire, Jonathan M. Kass, Esquire, Grant & Eisenhofer P.A., Wilmington, Delaware; Mark Lebovitch, Esquire, Jeroen van Kwawegen, Esquire (*argued*), Abe Alexander, Esquire, Bernstein Litowitz Berger & Grossmann LLP, New York, New York, Attorneys for Appellee City of Miami General Employees' and Sanitation Employees' Retirement Trust.

**STRINE**, Chief Justice:

## I. INTRODUCTION

This is an expedited appeal from the Court of Chancery's imposition of an unusual preliminary injunction.[1] City of Miami General Employees' and Sanitation Employees' Retirement Trust (the "plaintiffs") brought a class action on behalf of itself and other stockholders in C&J Energy Services, Inc. ("C&J") to enjoin a merger between C&J and a division of its competitor, Nabors Industries Ltd. ("Nabors"). The proposed transaction is itself unusual in that C&J, a U.S. corporation, will acquire a subsidiary of Nabors, which is domiciled in Bermuda, but Nabors will retain a majority of the equity in the surviving company. To obtain more favorable tax rates, the surviving entity, C&J Energy Services, Ltd. ("New C&J"), will be based in Bermuda, and thus subject to lower corporate tax rates than C&J currently pays.

To temper Nabors' majority voting control of the surviving company, C&J negotiated for certain protections, including a bye-law[2] guaranteeing that all stockholders would share *pro rata* in any future sale of New C&J, which can only be repealed by a unanimous stockholder vote. C&J also bargained for a "fiduciary out" if a superior proposal was to emerge during a lengthy passive market check, an unusual request for the buyer in a change of control transaction. And during that market check, a potential competing bidder faced only modest deal protection barriers.

---

[1] *City of Miami General Employees' and Sanitation Employees' Retirement Trust v. C&J Energy Services*, No. 9980-VCN (Del. Ch. Nov. 24, 2014) [hereinafter "Bench Opinion"]. The Court of Chancery certified its order for interlocutory appeal to this Court in accordance with Supreme Court Rule 42.

[2] Under Bermuda law, by-laws are spelled "bye-laws."

1

Although the Court of Chancery found that the C&J board harbored no conflict of interest and was fully informed about its own company's value, the court determined there was a "plausible" violation of the board's *Revlon* duties[3] because the board did not affirmatively shop the company either before or after signing.[4] On that basis, the Court of Chancery enjoined the stockholder vote for 30 days, despite finding no reason to believe that C&J stockholders – who must vote to approve the transaction – would not have a fair opportunity to evaluate the deal for themselves on its economic merits.

The Court of Chancery's order also required C&J to shop itself in violation of the merger agreement between C&J and Nabors, which prohibited C&J from soliciting other bids. The order dealt with this issue by stating "[t]he solicitation of proposals consistent with this Order and any subsequent negotiations of any alternative proposal that emerges will not constitute a breach of the Merger Agreement in any respect."[5]

But the Court of Chancery did not rely on undisputed facts showing a reasonable probability that the board had breached its fiduciary duties when it imposed this mandatory, affirmative injunction. Instead, it is undisputed that a deal with Nabors made strategic business sense and offered substantial benefits for C&J's stockholders. Moreover, the order stripped Nabors of its contractual rights even though the Court of Chancery did not make any finding that Nabors was an aider and abettor, or even a

---

[3] *Revlon v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986).
[4] Bench Opinion at 13-15.
[5] *City of Miami General Employees' and Sanitation Employees' Retirement Trust v. C&J Energy Services*, No. 9980-VCN, Order Granting Preliminary Injunction, Certifying Interlocutory Appeal, and Staying the Injunction Pending Appeal (Nov. 25, 2014) [hereinafter "Injunction Order"].

2

finding that there was a reasonable probability of a breach by C&J's board that Nabors could have aided and abetted.

We assume for the sake of analysis that *Revlon* was invoked by the pending transaction because Nabors will acquire a majority of New C&J's voting shares. But we nonetheless conclude that the Court of Chancery's injunction cannot stand. A preliminary injunction must be supported by a finding by the Court of Chancery that the plaintiffs have demonstrated a reasonable probability of success on the merits.[6] The Court of Chancery made no such finding here, and the analysis that it conducted rested on the erroneous proposition that a company selling itself in a change of control transaction is required to shop itself to fulfill its duty to seek the highest immediate value. But *Revlon* and its progeny do not set out a specific route that a board must follow when fulfilling its fiduciary duties, and an independent board is entitled to use its business judgment to decide to enter into a strategic transaction that promises great benefit, even when it creates certain risks.[7] When a board exercises its judgment in good faith, tests the transaction through a viable passive market check, and gives its stockholders a fully informed, uncoerced opportunity to vote to accept the deal, we cannot conclude that the board likely violated its *Revlon* duties. It is too often forgotten that *Revlon*, and later

---

[6] *See, e.g.*, *Revlon*, 506 A.2d at 179.
[7] *See, e.g.*, *Lyondell Chemical Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009); *Paramount Communications Inc. v. QVC Network Inc.*, 637 A.2d 34, 44 (Del. 1993) ("Delaware law recognizes that there is 'no single blueprint' that directors must follow."); *In Re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147 (Del. Ch. Aug. 8, 1988) (a pre-signing auction is not required where directors allowed for an effective post-signing market check).

cases like *QVC*,[8] primarily involved board resistance to a competing bid after the board had agreed to a change of control, which threatened to impede the emergence of another higher-priced deal. No hint of such a defensive, entrenching motive emerges from this record.

Furthermore, the Court of Chancery's unusual injunction cannot stand for other important reasons. Mandatory injunctions should only issue with the confidence of findings made after a trial or on undisputed facts.[9] Such an injunction cannot strip an innocent third party of its contractual rights while simultaneously binding that party to consummate the transaction.[10] To blue-pencil a contract as the Court of Chancery did here is not an appropriate exercise of equitable authority in a preliminary injunction order. That is especially true because the Court of Chancery made no finding that Nabors had aided and abetted any breach of fiduciary duty, and the Court of Chancery could not even find that it was reasonably likely such a breach by C&J's board would be found after trial. Accordingly, the judgment of the Court of Chancery is reversed.

## II. FACTS

### A. *The Competing Contentions of the Parties*

This expedited case has come before us without a formal opinion from the Court of Chancery making detailed fact findings under the standards that govern a preliminary

---

[8] *QVC*, 637 A.2d at 39.

[9] *See, e.g.*, *In re El Paso S'holders Litig.*, 41 A.3d 432, 449-51 (Del. Ch. 2012); *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 31 (Del. Ch. 2009).

[10] *See, e.g.*, *El Paso*, 41 A.3d at 432 (refusing to enjoin a merger that "would violate accepted standards for the issuance of affirmative injunctions and attempt to force [the buyer] to consummate a different deal than it bargained for"); *In Re Toys "R" Us, Inc. S'holders Litig.*, 877 A.2d 975, 1021 (Del. Ch. 2005).

4

injunction. We therefore are required to craft our own factual recitation in the first instance as to most aspects of the process. Our recitation will reflect this reality and our reluctance to make initial findings of fact on issues that were not fully developed below and that did not motivate the Court of Chancery to issue an injunction.

To frame our discussion of the facts, it is useful to set forth the basic contending positions of the parties. The plaintiffs argue that C&J's board entered into a change of control transaction without recognizing that it was doing so. With the mindset that it was acquiring an asset, the board never conducted an active market check to see if there were other buyers for C&J. The plaintiffs argue that the C&J board, despite having five independent members, was overly influenced by the CEO, chairman, and founder, Joshua Comstock, who was allegedly looking to acquire Nabors CPS to secure a new employment package for himself, and was therefore willing to cause C&J to pay more than it should. Furthermore, the plaintiffs point out that C&J's banker, Citigroup Global Markets, Inc. ("Citi"), had worked with Nabors previously and was suggested by Anthony Petrello, Nabors' CEO and board chairman, because Petrello wanted to employ C&J's preferred banker, Goldman Sachs, as his advisor on the deal. The plaintiffs contend that Citi acted as a banker for a preferred deal between two companies that it regarded as clients, rather than as an advisor solely focused on C&J's best interests.

The plaintiffs further argue that Comstock failed to keep the board adequately informed, did not take advantage of Nabors CPS' declining performance over the course of the negotiations, and had the board approve a poorly priced deal in order to secure a lavish pay package for himself. Most fundamentally, the plaintiffs argue that the board

5

failed to fulfill its fiduciary duties under *Revlon* in approving a transaction where Nabors would end up with majority voting control of C&J. Rather than engage in an active market check, the board signed up its favorite deal with the inadequate protections of a passive market check and certain bye-law provisions, which the plaintiffs characterize as protections for Comstock and his managers, not for C&J stockholders. Accordingly, the plaintiffs characterize the injunction below as a modest one that requires the board to conduct the shopping process it should have done in the first place.

The defendants counter that this is a highly favorable, strategic transaction that was approved by a board whose disinterestedness was not questioned by the Court of Chancery. Although the board authorized Comstock to lead the negotiations, the defendants stress that Comstock owned a 10% stake in C&J, and had no incentive to do anything to harm the value of those shares. Nor, say the defendants, did Comstock have any self-interested, non-business-related reason to favor the Nabors deal over any of the others that C&J had considered, even if he wanted a better compensation package. As important, the defendants argue that the entire board was apprised of the process throughout and approved the deal because it was beneficial to stockholders. They highlight the frequent communication between Comstock and the independent directors, especially Adrianna Ma, whose employer, General Atlantic, is a private equity firm that owned 10% of C&J's stock.[11] The defendants argue that *Revlon* does not apply, but even

---

[11] The plaintiffs attempt to cast aspersions on Ma's independence because Comstock supposedly "co-opted her" with a "potential consultancy deal" on the deal. Comstock mentions the possibility of engaging Ma and her team to provide diligence services in an email dated March 12, 2014. App. to Opening Br. at 2387. But Ma did not react to the possibility of working on the

6

if it did, the board satisfied its requirement to "act[] reasonably . . . to secure the transaction offering the best value reasonably possible."[12] They state that the Court of Chancery misapplied the standard for a preliminary injunction and also misinterpreted *Revlon* when it granted one and required the C&J board to shop the deal.

With those contentions in mind, we summarize the most relevant facts from the record below and the briefing by the parties.

### B.      The Key Players in the Deal Dynamic

C&J, a Delaware corporation founded in 1997, is an oilfield services provider. The company went public in 2011 and currently has a market capitalization of over $730 million.[13]   C&J's board has seven directors, five of whom are independent.  The only management directors are C&J's founder, chairman, and CEO, Comstock, and its CFO, Randy McMullen.  Nabors, which has a total market capitalization of over $3 billion, is a Bermuda exempt company that also provides oilfield services.[14]  As noted, Nabors' CEO and chairman is Anthony Petrello.  Nabors has two primary divisions: a completions and productions services division ("Nabors CPS") and a drilling and rig services division. None of C&J's board members had any prior affiliation with Nabors before beginning discussions about the transaction challenged in this litigation.

---

deal in her response email, nor does she mention the possibility again, at least in the record before us.  Without any other evidence, we do not find it plausible that Ma, a General Manager at a private equity firm with a $12 billion portfolio, which owned a 10% equity interest in C&J, would be co-opted by the possibility of a paid consultancy for Ma on this transaction.

[12] Reply Br. at 7 (quoting *In re Pennaco Energy, Inc.*, 787 A.2d 691, 705 (Del. Ch. 2001)).

[13] *C&J Energy Services Current Stock Information*, http://phx.corporate-ir.net/phoenix.zhtml?c=242928&p=irol-IRHome (last visited Dec. 17, 2014).

[14] *Nabors Fundamentals*, http://investor.nabors.com/phoenix.zhtml?c=70888&p=irol-fundTrading (last visited Dec. 17, 2014).

*C.      Citi's Trauber Introduces Nabors' Petrello and C&J's Comstock*

In 2013, C&J's board began to explore strategic acquisitions to grow its business, and authorized Comstock to lead the search. By the end of the year, Comstock had identified at least three potential "strategic partners" and made an offer for one company, but no discussions advanced beyond the initial stages.[15]

In January 2014, Stephen Trauber, Vice Chairman and Global Head of Energy Investment Banking at Citi, approached Comstock with an unsolicited pitch book, suggesting Nabors CPS as a target. Nabors was at that point considering different options for Nabors CPS, including selling it or taking it public.[16] Citi had previously worked as a financial advisor to Nabors, and Trauber was a social acquaintance of Petrello's.[17] Before identifying Nabors CPS as a target, C&J's primary financial advisor was Goldman Sachs,[18] but when the companies began negotiating, Petrello told Comstock that Nabors' board wanted to use Goldman, and suggested that Comstock work with Citi instead.[19] Comstock complied, asserting that it was "the right thing to do" because Citi had surfaced the deal for C&J to consider.[20] But Comstock testified at his

---

[15] *See* App. to Opening Br. at 1643 (Comstock Deposition at 18-19).

[16] According to Petrello's deposition, "every banker in the world was approaching us about ideas to do something." App. to Opening Br. at 628 (Petrello Deposition at 15).

[17] App. to Opening Br. at 633-36 (Petrello Deposition at 35-46). Petrello testified that "prior to 2011," when he became CEO, Nabors had used Citi "more than any other banker," but "Trauber never had a lock" on Nabors' business, and when Petrello became CEO, he began working with other banks, including Goldman, more than Citi. *Id*. at 638-39 (Petrello Deposition at 58-62).

[18] Goldman helped advise C&J's board on three potential acquisition targets in the fall of 2013, and led C&J's IPO in 2011. App. to Opening Br. at 1643 (Comstock Deposition at 19).

[19] Petrello testified at his deposition that he wanted Nabors to use Goldman because he considered them "best in class" on strategic issues. App. to Opening Br. at 640 (Petrello Deposition at 62).

[20] App. to Answering Br. at 718 (Comstock text message to McMullen dated Feb. 28, 2014).

deposition that he would have otherwise chosen to work with Goldman because Goldman "really knows [the] business well."[21] Ma further explained that the board did not consider engaging other bankers because Comstock "wanted to keep it confidential and not let [the deal] leak to other banks in the industry," and the other directors agreed that the deal was "a highly confidential situation" and that "any leak could meaningfully change the economics of the transaction."[22]

In May 2014, C&J's board asked Citi to provide C&J with financing for the transaction in addition to serving as the financial advisor. The directors recognized the conflict that would result, so they asked Tudor, Pickering, Holt & Co. Securities, Inc. ("Tudor") for another independent fairness opinion.

As mentioned, the plaintiffs argue that Citi's Trauber seemed to act more as a banker for the deal than for C&J. Comstock testified during his deposition that he believed Trauber was communicating with Petrello without Comstock's authorization: "I felt like Mr. Trauber was giving feedback to Tony [Petrello]. So if I was negotiating with Mr. Trauber, I was negotiating with Tony."[23] Comstock's perception of needing to "negotiate" with his own financial advisor gives color to the plaintiffs' allegation that the deal process fell short of the ideal.

### D. Negotiating the Deal

Consistent with the plaintiffs' depiction of Trauber as a banker for the deal, the transaction process began with a January 2014 meeting between Comstock and

---

[21] App. to Opening Br. at 1647 (Comstock Deposition at 36).
[22] App. to Opening Br. at 3167 (Ma Deposition at 16-17).
[23] App. to Opening Br. at 1655 (Comstock Deposition at 67-68).

McMullen, on behalf of C&J, and Petrello, on behalf of Nabors, with Trauber in an as-yet-undefined role.[24] After that meeting, Comstock believed that a transaction was worth pursuing: he perceived that Nabors CPS was underutilized by Nabors because the company was focused on its other division, and he thought that Nabors CPS would be a "good fit . . . operationally, culturally, and strategically."[25]

Discussions between Comstock and Petrello continued over the next several months. On March 5, C&J's senior management met with Petrello and other Nabors executives to analyze the transaction, including the possibility of structuring the deal so that the surviving company would be domiciled outside of the U.S. and thus pay tax at lower rates, through what is now widely called a "corporate inversion."[26] Because Nabors is a Bermuda-based company, C&J could avoid paying U.S. corporate taxes by merging into Nabors and re-domiciling in Bermuda. The tax benefits from structuring the transaction in this way are substantial – Citi estimated the savings as worth $200 million in net present value.[27]

Both parties agreed that Comstock and C&J's management team would manage the combined entity. But for the re-domiciling to be effective for tax purposes, Nabors would need to own a majority of the new company. On April 3, 2014, Comstock

---

[24] Serge Tismen, who worked with Trauber on the team at Citi that advised C&J, testified during his deposition that Citi understood itself as working solely for C&J from the initial discussions between Comstock and Petrello in January. App. to Opening Br. at 658 (Tismen Deposition at 31). C&J's board did not formally discuss the terms of the engagement letter with Citi until a board meeting on April 8. *See* App. to Opening Br. at 1619 (April 8 Meeting Minutes).

[25] App. to Opening Br. at 2352 (email chain from Comstock to Petrello, dated Jan. 16, 2014).

[26] *See Fact Sheet: Treasury Actions to Rein in Corporate Tax Inversions*, U.S. DEPT. OF THE TREASURY, Sept. 22, 2014, *available at* http://www.treasury.gov/press-center/press-releases/Pages/jl2645.aspx.

[27] App. to Opening Br. at 2032-33 (Citi Presentation to C&J Board, June 24, 2014).

convened a special board meeting to discuss the potential deal. Comstock had previously discussed acquiring Nabors CPS with some of the directors, but the April 3 meeting appears from the record to be the first time he received formal approval to negotiate.[28] C&J's board conveyed excitement about the substantial tax benefits that re-domiciling in Bermuda would provide, in addition to the other deal synergies, but also expressed worry about losing control because Nabors would own a majority of the stock in the surviving entity.[29] Director Ma testified in her deposition that the board was aware of the importance of a change of control because legal counsel had explained during a board call "what the *Revlon* rules were."[30]

After discussing the tradeoffs between losing control and tax savings, C&J's directors unanimously approved a non-binding offer of $2.6 billion, which Comstock delivered in a letter to Petrello dated April 4.

### E.     Pricing the Deal

Petrello rejected the April 4 offer, asserting that Nabors CPS was worth a minimum of $3.2 billion. The parties continued to negotiate over price while Comstock and his team conducted due diligence on Nabors CPS. The plaintiffs contend that these negotiations were tainted by Comstock's self-interest, because Petrello made overtures

---

[28] *See* App. to Opening Br. at 2225.
[29] The board was advised on tax issues by representatives from Deloitte Tax LLP, which C&J had retained to conduct tax and accounting due diligence on Nabors CPS.
[30] App. to Opening Br. at 3169 (Ma Deposition at 24).

assuring Comstock that he would receive a lucrative compensation package if the deal was completed.[31]

After Petrello rejected Comstock's offer, Comstock emailed the other directors on April 14 to inform them of his intention to raise C&J's offer to $2.75 billion to keep the deal alive. He explained that he believed "[t]he upside potential here is like no other M&A deal we have come across."[32] But he acknowledged concerns from board members about "the slippery slope up on pricing," and the need to "be very vigilant" in proving "the possibility of . . . results in due diligence."[33] The other board members agreed to raise the offer.[34] Accordingly, Comstock sent a second letter to Petrello on April 16, offering $2.75 billion, which represented a multiple of 6.9 over 2014 EBITDA.

On April 22, Nabors released its first quarter results for 2014, which were lower than Nabors expected and worse than Comstock or C&J's board had anticipated.[35] Comstock expressed concern that Nabors CPS was unlikely to generate its forecasted EBITDA for 2014, which would threaten the proposed valuation for the deal.[36] At the same time, Comstock questioned the credibility of Nabors' financial results, although he

---

[31] For example, the plaintiffs point out that Comstock's initial offer letter on April 4 stated that employment agreements would "need to be incorporated into our definitive transaction agreements." App. to Opening Br. at 1864. Comstock also mentioned in a text message to McMullen on April 11 that Petrello said "he would give us what we wanted as management contracts but he wanted us there." App. to Answering Br. at 781.

[32] App. to Opening Br. at 703 (Comstock email dated April 14, 2014).

[33] *Id.*

[34] Comstock testified during his deposition that he did not need the board's formal approval to increase the offer, because he had received board approval on April 3 to "negotiate the best deal possible for the shareholders. . . ." But he was "just keeping my board abreast of everything that we were doing." App to Opening Br. at 1664 (Comstock Deposition at 103-04).

[35] App. to Opening Br. at 1660 (Comstock Deposition at 89) ("We were caught completely off guard with [the first quarter performance.]").

[36] App. to Opening Br. at 1660 (Comstock Deposition at 88-89).

stated in his deposition that he was reacting to what turned out to be an error in Nabors' proprietary accounting system.[37]

Notwithstanding these negative developments for Nabors, Petrello rejected the $2.75 billion offer on April 23, arguing that the proposal did not reflect the full intrinsic value of Nabors CPS, or the value of the synergies the combination would create.[38] According to Nabors Red Lion Ltd.'s Form S-4 filing with the SEC, C&J's board members discussed Petrello's demands, but there is no evidence of these discussions in the record before us. Comstock responded to Petrello in a letter dated April 25, noting his fear that Nabors CPS would be unable to achieve the level of EBITDA projected earlier in the month. But rather than reduce the valuation he was using as a basis for price negotiations, Comstock agreed to use more favorable forward-looking projections into 2015 and "stretch" the multiple from 6 to 6.5.[39] The April 25 letter set a maximum value for Nabors CPS at $2.9 billion.[40]

Because there is no evidence that this new offer was approved by the board in advance, there is at least some support for the plaintiffs' contention that Comstock at times proceeded on an "ask for forgiveness, rather than permission" basis. But as the defendants hasten to point out, the board gave Comstock broad authority to negotiate, and

---

[37] App. to Opening Br. at 859 (email chain between Comstock and Rice, dated June 13, 2014) ("Costs aren't matching up, costs are moved out, etc, etc, just to show improved results. I'm close to calling it quits on this deal."). But C&J's diligence team ultimately determined that what had seemed to be "creative accounting" was actually miscoded expenses. See App. to Opening Br. at 1673-75 (Comstock Deposition at 141-148).
[38] App. to Opening Br. at 1888.
[39] App. to Opening Br. at 945 (email chain between Restreppo and Petrello, dated June 19).
[40] App. to Opening Br. at 1878.

13

he kept them apprised of major developments, even if he did not seek approval at every stage of the process.[41]

To wit, on April 29, C&J's board met for its regularly scheduled meeting. According to the minutes, Comstock presented an update on the negotiations with Nabors, including Petrello's response to the April 23 offer.[42] That evening, after the board meeting, Comstock and Petrello agreed to a deal based on a valuation of $2.925 billion for Nabors CPS during a telephone conversation. The plaintiffs accurately contend that Petrello used this conversation to assure Comstock that he and his fellow C&J managers would receive aggressive employment agreements. But the record also reflects that Comstock did not follow up on these overtures to discuss specifics during the negotiation process.

The plaintiffs allege that the valuation adjustments made following the announcement of Nabors CPS' decline in performance demonstrate that the C&J stockholders got a bad deal. But there is also a colorable basis to believe that Comstock was playing the negotiation game skillfully when he reacted to the downward movement in Nabors CPS' performance as he did.[43] The record contains evidence that Comstock

---

[41] *See, e.g.*, App. to Opening Br. at 3174 (Ma Deposition at 42-43).

[42] The record does not reflect any additional detail beyond that update, including whether or not the board formally approved offering more than $2.75 billion. App. to Opening Br. at 1623.

[43] Although the plaintiffs attempt to cast many of Comstock's statements in an ominous light, at least a plausible reading of the record suggests that Comstock was aggressively negotiating to create value for C&J's stockholders, and that his belief that the deal would be valuable to them was sincere. Comstock could have been using his communications as a "cover" for his true self-interest in pursuing a deal, but many of his emails and text messages – in which he discusses his often negative perceptions of Nabors; Nabors' banker, Goldman; his own bankers, Citi and Tudor; Petrello; and others – read as authentically salty, sent by a sophisticated businessman and

attempted to protect C&J stockholders using strategic negotiating tactics; for example, Comstock made clear throughout the process that he was willing to cease negotiations if terms protecting C&J's stockholders were not reflected in the final deal.[44] He also revealed in internal emails with McMullen and other C&J directors that he thought focusing on Nabors CPS' declining performance would be an effective negotiating strategy to keep the price low, and that the deal was worthwhile because of the value he and his management team could bring to the combined entity.[45] In other words, the record can be reasonably read to suggest that Comstock believed in good faith that he should not pile onto Nabors' woes, but rather use the evidence of Nabors CPS' declining performance to keep the price negotiations at a positive value for C&J while ensuring that, in the end, the company secured an asset whose acquisition he believed would generate valuable benefits for C&J's stockholders. We also note that Comstock ultimately lowered C&J's offer to $2.86 billion days before closing because C&J's "diligence only proved" some of Nabors CPS' projected EBITDA.[46]

---

the founder of the company, who believed he had found a deal that would grow "his" company and benefit all stockholders.

[44] *See, e.g.*, App. to Opening Br. at 2343 (email from Comstock to Ma, dated April 30, 2014, explaining that "If we find on Monday [during a meeting with Nabors] that we can't get our needs on governance, we walk"); 2487 (email from Comstock to Citi advisors, dated June 11, stating that "At the end of the day [] to lose all the work we've done, but fair is fair. I can't do the deal without these concessions. I'm even struggling with $2.8b. The shareholder value is at [C&J] not [Nabors CPS]. I have to create more through this deal, not less"); 2489 (earlier email in exchange from Comstock noting that "I think this move is necessary for Fairness Opinion and to meet my and my Board's fiduciary duties to our shareholders").

[45] *See, e.g.*, App. to Opening Br. at 703-06.

[46] App. to Opening Br. at 2432.

15

Moreover, we note that Comstock continually shared the details of the valuation changes and negotiations with the C&J board,[47] which was majority-independent, and which had the final say in approving the deal before it went to a stockholder vote. Although it authorized Comstock to continue negotiations on its behalf in the April 3 meeting, C&J's board remained engaged in the process. By way of example, the board met seven times between April 3 and June 24. The truncated record contains several emails from Comstock to the other directors during that time, keeping them apprised of relevant findings from his diligence, including the declining state of Nabors CPS' business. Ma confirmed in her affidavit and deposition that the board broadly authorized Comstock to negotiate a deal and he "brief[ed] us all along the way."[48] During the negotiating process, Trauber remarked in an email to Comstock that in his "26 years" of doing "hundreds" of deals, he had "never seen a CEO have to provide their board so much data day-to-day and have to constantly answer emails from the board."[49] Even if the board was not aware of every "blow by blow,"[50] the record suggests that the board

---

[47] *See, e.g.*, App. to Opening Br. at 703-706 (email exchange between Comstock and other board members about valuation, dated April 13-14, 2014); 2291 (email Comstock to directors Ma, Roemer, and Friedman, dated April 10, 2014) ("Since you three are the PE professionals on the board, I wanted to get your advice on a few things tonight [for a meeting with Petrello].").

[48] App. to Opening Br. at 3174 (Ma Deposition at 42-43). Ma recalled that "[i]t was never my expectation for [Comstock] to check with us every single step of the way in arriving at an agreed upon price below 3 billion that's non-binding where we can go and diligence the business and go after synergies. [Comstock] chose to keep us abreast every step of the way partly because he always keeps the Board involved." App. to Opening Br. at 3172 (Ma Deposition at 36).

[49] App. to Opening Br. at 709 (Trauber email to Comstock dated April 15, 2014).

[50] App. to Opening Br. at 3176 (Ma Deposition at 53).

was informed about the transaction they would eventually vote to approve, especially the final terms of the deal.[51]

The board also considered whether to actively shop C&J to potential buyers. Ma testified at her deposition that the board asked Citi whether "other strategic bidders" would be interested in C&J, and the board "considered potential strategic bidders for C&J as part of our ability and certainty in closing the Nabors transaction."[52] She noted that Citi assessed the probability of engagement from other potential buyers as "low."[53]

### F.    The Final Deal Terms

After these extensive negotiations, Comstock and Petrello agreed to a valuation for Nabors CPS of $2.86 billion, which was premised on a forecast of Nabors CPS' 2015 EBITDA of $445 million[54] and an implied multiple of 6.4.[55] This price was lower than Petrello's initial ask of $3.2 billion, but higher than C&J's initial offer of $2.6.

---

[51] For example, Comstock testified at his deposition that he did not inform the board of his decision to change the multiple used to value Nabors CPS. App. to Opening Br. at 1680 (Comstock Deposition at 168). But Ma testified that the board "recognized the multiple that we're paying for [Nabors CPS] going into this deal." App. to Opening Br. at 3177 (Ma Deposition at 55). And Comstock did discuss his plan to offer to use a 6.5 multiple to increase the valuation with directors Ma, Roemer, and Friedman in an email dated April 10, 2014. App. to Opening Br. at 2291.

[52] App. to Opening Br. at 3168 (Ma Deposition at 19-20).

[53] *Id*. at 3169 (Ma Deposition at 22).

[54] Although the plaintiffs discovered an email purportedly from C&J's CFO, McMullen, to Comstock calling $445 million an "upside case," McMullen asserted in an affidavit that $445 represented "management's expected or base case," not an "upside case." App. to Opening Br. at 1853 (McMullen Affidavit at 3). McMullen's email did not originally contain the phrase "upside case," but in a version forwarded to Petrello, Comstock added a sentence suggesting that $445 was "an upside case." *Compare* App. to Opening Br. at 1856 (original email from McMullen) *with* 1860 (email forwarded by Comstock). Comstock submitted an affidavit recalling that he had added the sentence as "a negotiating tactic." App. to Opening Br. at 2553 (Comstock Affidavit at 2). Comstock also explained to the Citi team that his team was comfortable with forecasting EBITDA of $450 million based on their diligence. App. to

17

To consummate the transaction, Nabors would create a new subsidiary, Red Lion, into which it would transfer its CPS business. C&J would then merge with Red Lion. C&J's former stockholders would own 47% of the combined entity, and their shares would be converted into Red Lion common stock on a 1:1 basis in a tax-free transaction. Nabors would own the remaining 53%, and receive approximately $938 million in cash.[56] The entity would then be renamed C&J Energy Services, Ltd., and be listed under C&J's current ticker, CJES, on the New York Stock Exchange. Because New C&J would be a Bermuda corporation, the rights of its stockholders would be governed by Bermuda law, rather than Delaware law.

To ensure that C&J's stockholders would retain some control over New C&J, C&J's board also insisted on several corporate governance protections. Under the merger agreement, C&J stockholders would have the power to designate four board members, including Comstock as the chairman of the board.[57] Comstock would become CEO and

Opening Br. at 2517. The defendants also point out that because their deal thesis was premised on what "C&J could do with" Nabors CPS, it "benefitted C&J to steer price negotiations away from *pro forma* value" (*i.e.*, how valuable Nabors was when the synergies with C&J were considered) and focus on stand-alone EBITDA (what it could earn on its own as a going concern). Reply Br. at 15.

[55] *See* App. to Opening Br. at 2023 (Citi valuation analysis presented to C&J board on June 24). Alternatively, the deal reflected a 7.3 multiple of Nabors CPS' estimated EBITDA for the second quarter of 2014 through the first quarter of 2015, which was forecast as $390 million. By comparison, Nabors CPS' 2014 EBITDA was estimated at $340 million. Both companies considered Nabors CPS' first quarter 2014 performance to be anomalous because of weather conditions that did not affect C&J's business.

[56] The total will be dependent on C&J's stock price at the time of closing.

[57] Nabors described the selection of Comstock as chair as a mutual decision. *See* App. to Opening Br. at 633 (Petrello Deposition at 34). The plaintiffs attempted to portray the decision to guarantee board seats to four former C&J directors as a potential conflict, which the Court of Chancery effectively rejected: "The five-year guarantee is a unique status and it raises concern. But it certainly does not call into question the independence of the board or the disinterestedness

18

McMullen would become President and CFO. To ensure that C&J retained a controlling interest in the entity, C&J also negotiated the following requirements:

(i) For a period of five years, a two-thirds vote of the stockholders of the combined entity will be required to amend the bye-laws (unless approved by Comstock and at least three directors not nominated by Nabors); sell the company; issue stock; or repurchase more than 15% of the outstanding shares of the company in a given year;

(ii) *In the event of a sale of the company or major assets, all stockholders will receive consideration of the same type and of the same amount calculated on a per share basis. This bye-law provision cannot be amended without a unanimous stockholder vote*;

(iii) From the closing date until the earlier of the five year anniversary of the effective date or the date that Nabors owns less than 15% of the combined entity's shares (the "standstill" period), Nabors will be prohibited (without a two-thirds board vote) from acquiring additional shares beyond its ownership stake as of closing; soliciting or encouraging any proposal for a business combination; soliciting or becoming a participant in the solicitation of any proxy related to any vote, or agreeing to vote with any person undertaking a "solicitation"; participating in a "group" with respect to securities of the combined entity; granting proxies to any third party (other than as recommended by the board) or entering into any understanding or agreement with respect to the voting of equity securities of the combined entity; seeking additional representation on, or proposing any changes to the size of, the board of directors;

(iv) Board members will be nominated by a three-member nominating committee, two of whom will be current C&J directors. The board will be classified with current C&J directors in each class;

(v) Without a two-thirds vote of the combined entity's board, and during the standstill period, Nabors can only sell its stock to a person or group that is not subject to SEC Rule 13d, *i.e.*, the transferee cannot (i) hold the securities with the "purpose, or with the effect of, changing or influencing the control" or (ii) own more than 20% of

of the board, especially since who was going to serve on the new board was not fully determined at the time the merger agreement was entered into." Bench Opinion at 12.

19

the combined entity. *If Nabors chooses to sell more than 10% of the outstanding shares to a person or group, the combined entity will have a right of first refusal. Nabors will be prohibited from selling its stock to certain competitors. If any other company wishes to buy a controlling stake in the combined entity, they will be required to make an offer for the whole company*; and

(vi)    If Nabors violates any of the standstill provisions of the merger agreement, the violation will provide a basis to terminate the employment of certain members of the post-merger management team who are currently affiliated with Nabors.[58]

C&J also bargained for a no-solicitation clause with a "fiduciary out" to allow C&J to negotiate with third parties under certain circumstances; a "fiduciary out" allowing C&J to terminate the deal in favor of a superior proposal; and a modest $65 million termination fee (2.27% of the deal value). And although Comstock signed a voting support agreement committing his shares to vote for the merger, he would be released from that agreement if the C&J board changed its recommendation in favor of the deal or otherwise exercised its "fiduciary out."[59]

C&J's board considered the formal terms of the transaction at a special board meeting on June 24. Citi and Tudor both presented valuation analyses and fairness opinions to the board. Both financial advisors found that the transaction would be fair to stockholders, and that it would add value to C&J's stock.[60]

---

[58] App. to Opening Br. at 146-243 (Merger Agreement).

[59] *See* App. to Opening Br. at 372 (Support Agreement Section 1.3: Non-Solicitation); 377 (Section 2.12: Stockholder Capacity).

[60] Citi estimated that C&J stockholders would enjoy a 27% increase in EPS in 2015, an 18% increase in 2016, and a 17% increase in 2017. Citi's discounted cash flow model predicted a 15% premium. Tudor estimated that the value of C&J's stock would increase between $1.09 and $3.17 per share.

20

Following discussions, the board unanimously approved the transaction, subject to the approval of C&J stockholders, with the intention to close before the end of 2014. The deal was publicly announced the following day, on June 25. The stock market reacted positively to the news: shares of both companies' stock rose, and analyst coverage largely viewed the transaction as favorable to C&J's stockholders.[61]

### G.     Comstock's Compensation Package

C&J's attorneys advised the current board that it would be "best from a fiduciary perspective to negotiate the deal terms and get those settled and agreed to before introducing the employment agreements."[62] Consistent with this approach, Comstock deferred negotiating about the specifics until late June.[63] But as the plaintiffs point out, Petrello had assured Comstock throughout the process that he would be aggressive in protecting Comstock's financial interests if a deal was consummated.

---

[61] *See, e.g.*, Tess Stynes, *C&J Energy to Merge With Nabors Industries Unit*, WALL STREET JOURNAL (June 25, 2014) ("C&J Energy shares soared 20% to $39.50 in after-hours trading, while Nabors shares rose as much as 10% to $30."); *see also C&J Energy's $2.8B Merger with Nabors Fracking Unit is Win-Win for Both*, THESTREET.COM (June 26, 2014), http://www.thestreet.com/_yahoo/video/12758635/cj-energys-28b-merger-with-nabors-fracking-unit-is-win-win-for-both.html; Matt DiLallo, *Deal Pushes C&J Energy Services Inc. Into the Fracking Top 5*, THE MOTLEY FOOL (June 26, 2014), http://www.fool.com/investing/general/2014/06/26/fracking-deal-fuels-cj-energy-services-inc-into-th.aspx ("With one deal, C&J Energy Services has transformed from a niche premium completion service provider to an all-around oil-field service provider.").

[62] App. to Opening Br. at 2519 (Comstock email dated June 12, 2014). Comstock stated in an email exchange on June 11 to the Citi advisors that "once agreed on terms [of the merger agreement], we will then share employment agreements. I don't want one leveraged against the other and the potential conflict associated with that. We can negotiate those separately once deal terms are set." App. to Opening Br. at 2489.

[63] The Court of Chancery also observed that the employment "agreements were not negotiated until a couple of months after the merger agreement was signed." Bench Opinion at 6.

21

At approximately the same time that C&J's board approved the deal, Comstock asked Petrello to sign a side letter affirming that C&J's management would run the surviving entity and endorsing a generous compensation package. Comstock negotiated for: a $1.1 million annual base salary, in addition to a bonus targeted at 200-300% of that amount; a lump-sum $3.3 million "success cash bonus"; and a "success equity bonus" of 500,000 restricted stock units, vested over three years, worth approximately $15.8 million.[64] He would also be paid approximately $173 million in severance if his employment was terminated without cause.[65] By comparison, Comstock's base salary in 2014 is $875,000, with a target bonus range of 100-200%. He also received a grant of restricted stock worth $3.27 million.[66] Comstock's current severance package is also less generous, in part because it was premised on a lower salary level, but also by its own terms.[67] His current compensation package at C&J is thus more modest than what he stands to receive as CEO of New C&J if the deal is consummated.

---

[64] Nabors Red Lion Limited Form S-4, as filed with the Securities and Exchange Commission on December 1, 2014, *available at* http://www.cjenergy.com/downloads/Nabors_Red_Lion_Limited_-_Form_S-4_-_Amendment_4.pdf.

[65] App. to Opening Br. at 1691 (Comstock Deposition at 210).

[66] Comstock's base salary in 2013 was $740,000. He also received a bonus of $1,110,000 and 138,033 restricted stock units, worth $3.27 million. *See* C&J Energy Services, Inc. Definitive Proxy Statement, Schedule 14A, April 10, 2014.

[67] For example, under his current severance package, Comstock is only entitled to a prorated percentage of his annual bonus if the date of severance is after June 30; immediate vesting of unvested options and restricted stock; additional severance payments based on his base salary in effect on the date of termination; and a lump sum equal to COBRA premiums for the longer of the remaining term of his employment agreement or one year (not to exceed two years). C&J Energy Services, Inc. Definitive Proxy Statement, Schedule 14A, April 10, 2014. Under the proposed severance package, Comstock will be entitled to his full annual bonus, regardless of when he is terminated; full vesting of his long-term equity compensation with his unexercised stock options exercisable for the full term; severance payments equal to two times the sum of his

When Petrello hesitated to sign the letter, objecting to some of Comstock's demands, Comstock threatened to "not sign . . . and not announce the transaction."[68] Comstock emailed the other directors to keep them informed of what he characterized as Petrello's "last minute gamesmanship."[69] But a few hours later, Petrello agreed to sign the letter with some modifications,[70] and the deal was announced as planned.[71]

\*   \*   \*

The evidence from the record thus provides some support for the arguments made by both sides in this case. The evidence showing that Comstock was focused on his compensation casts shade on his motivations, as he ultimately secured a generous package. That said, the Court of Chancery did not find that Comstock likely breached his

---

base salary and target bonus; and a lump sum equal to COBRA premiums for 18 months. Nabors Red Lion Limited Form S-4 at 105.

But Comstock's insistence on a larger severance also has a rational economic basis. In five years, after all, many of the corporate governance protections under the merger agreement will fall away, and his continued employment will be his primary means of protecting his investment and ensuring that he has an influence over the direction of the company. Comstock founded C&J and has a 10% equity stake, worth $170 million on the day the board approved the deal, which is likely his largest asset. By doing a transaction with Nabors, Comstock left himself in a situation where much of his wealth could be left entirely within Nabors' control if he were terminated. The admittedly large severance could thus be seen as a protection for Comstock against having his firm-specific capital stuck in New C&J if he was no longer its CEO, by requiring a payment roughly equivalent to its value to be paid to him if he was terminated.

[68] App. to Opening Br. at 1693 (Comstock Deposition at 220).

[69] App. to Opening Br. at 2528 (Comstock email dated June 25, 2014).

[70] Comstock's proposal included plans for an "integration incentive plan," under which Comstock would be eligible to receive up to 20% of the shares set aside in the company's long-term incentive plan, with the exact amount to be determined by the compensation committee of the new board. But after Petrello objected to the incentive plan, it was removed from contemplation as of June 25. App. to Opening Br. at 1691 (Comstock Deposition at 212).

[71] App. to Opening Br. at 1693 (Comstock Deposition at 221).

duty of loyalty or faced a certain conflict of interest,[72] and we cannot do so ourselves as a factual matter on this record.

Although Comstock appeared interested in improving his compensation, there is no basis in the record or market dynamics to suggest that a deal with Nabors was necessary for him to achieve that objective. Selling to a private equity buyer or purchasing another substantial asset, which C&J had considered in late 2013, would have the potential to generate similar benefits for him. As important, Comstock faced no threat to his tenure, held 10% of C&J's stock, and had a strong interest in maximizing the value of those shares. Given that Nabors would own a majority of New C&J's stock, there was also a logical reason for him and his management team to seek strong protection against removal, especially because C&J's deal thesis was premised on the higher valuation its team could achieve in managing Nabors CPS' underutilized assets.[73]

Additionally, C&J stockholders have the opportunity to vote, on a non-binding, advisory basis, on the compensation proposals for C&J executives as part of the same proxy as the binding vote to approve the merger agreement. And the employment agreement Comstock negotiated is not binding on the board of New C&J, which must approve any compensation package. Most important of all, any potential conflict must be balanced against the numerous meetings that the C&J board held during the process, the board's close involvement and communications with Comstock throughout, and the

---

[72] Bench Opinion at 13.
[73] Indeed, even the plaintiffs acknowledge that C&J was well-managed, compared to "struggling" Nabors CPS. *See, e.g.*, Opening Br. 6-8.

24

reality that the board's favorable view of the transaction was validated by the stock market reaction.

Likewise, the plaintiffs' argument that the board lacked awareness of the change in control implications of the deal is belied by the protective provisions built into the merger agreement. That agreement not only ensured that C&J stockholders would share *pro rata* in any future control premium if New C&J is sold, but also contained an unusual buy-side "fiduciary out" allowing for a lengthy and viable post-signing market check.

It is therefore unsurprising that the Court of Chancery was unable to find a reasonable probability of success on the merits or that any member of the board was conflicted.[74] Although the record before us reveals a board process that sometimes fell short of ideal, *Revlon* requires us to examine whether a board's overall course of action was reasonable under the circumstances as a good faith attempt to secure the highest value reasonably attainable.[75] When that standard is applied to this record, we cannot conclude that the plaintiffs have proven that the majority-independent C&J board acted unreasonably in negotiating a logical strategic transaction, with undisputed business and tax advantages, simply because that transaction had change of control implications.

---

[74] *See* Bench Opinion at 13 ("Perhaps the record will evolve, but as of now, it certainly looks as if the board was not conflicted. . . . I do not see on this record any basis for loyalty claims."); *see also In re TriQuint Semiconductor, Inc. S'holders Litig.*, 2014 WL 2700694, at *3 (Del. Ch. Jun. 13, 2014) (finding that continuing on the board of new company is not a disqualifying interest); *Krim v. ProNet, Inc.*, 744 A.2d 523, 528 n.16 (Del. Ch. 1999) ("[Th]e fact that several directors would retain board membership in the merged entity does not, standing alone, create a conflict of interest.") (citing *Grobow v. Perot*, 526 A.2d 914, 921 (Del. Ch. 1987)).

[75] *See generally QVC*, 637 A.2d at 41; *see also Unitrin, Inc. v. American General Corp.*, 651 A.2d 1361, 1385-86 (Del. 1995).

## III.   ANALYSIS

### A.   The Court Of Chancery Applied The Wrong Standard Of Proof And Evidentiary Burden For A Preliminary Injunction

To obtain a preliminary injunction, the plaintiffs must demonstrate: (1) a reasonable probability of success on the merits; (2) that they will suffer irreparable injury without an injunction; and (3) that their harm without an injunction outweighs the harm to the defendants that will result from the injunction.[76] Delaware courts have emphasized that in cases like this, where the plaintiff seeks to enjoin a corporate transaction, the showing of a reasonable probability of success must be "particularly strong" when "no other bidder has emerged despite relatively mild deal protection devices."[77]

In this case, although the Court of Chancery correctly identified the standard of review for a preliminary injunction, it misapplied that standard when it found that there was "a *plausible* showing of a likelihood of success on the merits as to a breach of the duty of care, and that goes to an absence of an effort to sell."[78] The court also stated that the question "is a very close call,"[79] outlined substantial arguments against granting the injunction, admitted that the principle that stockholders are entitled to a particular sales process was "not a particularly satisfying one,"[80] and highlighted that no rival bidders had

---

[76] *See, e.g.*, *Revlon*, 506 A.2d at 179.

[77] *Wayne Cnty. Emps' Ret. Sys. v. Corti*, 954 A.2d 319, 331 (Del. Ch. 2008); *see also In re Pennaco Energy, Inc.*, 787 A.2d 691, 703 (Del. Ch. 2001) ("A preliminary injunction is a powerful remedy that must be earned, and [Delaware courts are] cautious about using that remedy where it might endanger or delay stockholders' receipt of a control premium in a situation where no competing bid has emerged.").

[78] Bench Opinion at 13.

[79] *Id.*

[80] *Id.* at 14.

emerged in the five months since the announcement despite modest deal protections.[81]  A party showing a "reasonable probability" of success must demonstrate "that it will prove that it is more likely than not entitled to relief."[82]  The Court of Chancery's own decision indicates that the plaintiffs did not carry that burden in this case, but the Court of Chancery failed to apply the correct standard of review when it nevertheless awarded the plaintiffs' requested injunctive relief.

## B.   The Plaintiffs Have Not Demonstrated A Reasonable Probability Of Success On The Merits

### 1.   *The Court of Chancery's Ruling Rested on an Erroneous Understanding of What* Revlon *Requires of a Board of Directors*

Not only did the Court of Chancery fail to apply the appropriate standard of review, its ruling rested on an erroneous understanding of what *Revlon* requires.  *Revlon* involved a decision by a board of directors to chill the emergence of a higher offer from a bidder because the board's CEO disliked the new bidder, after the target board had agreed to sell the company for cash.  *Revlon* made clear that when a board engages in a change of control transaction, it must not take actions inconsistent with achieving the highest immediate value reasonably attainable.[83]

But *Revlon* does not require a board to set aside its own view of what is best for the corporation's stockholders and run an auction whenever the board approves a change of control transaction.  As this Court has made clear, "there is no single blueprint that a

---

[81] *Id.*

[82] *Mitchell Lane Publishers, Inc.*, *v. Rasemas*, 2014 WL 4925150, at *3 (Del. Ch. 2014).

[83] *Revlon*, 506 A.2d at 182 ("The duty of the board [in a change of control transaction] . . . [is] the maximization of the company's value at a sale for the stockholders' benefit.").

27

board must follow to fulfill its duties,"[84] and a court applying *Revlon*'s enhanced scrutiny must decide "whether the directors made a *reasonable* decision, not a *perfect* decision."[85]

In a series of decisions in the wake of *Revlon*, Chancellor Allen correctly read its holding as permitting a board to pursue the transaction it reasonably views as most valuable to stockholders, so long as the transaction is subject to an effective market check under circumstances in which any bidder interested in paying more has a reasonable opportunity to do so.[86] Such a market check does not have to involve an active solicitation, so long as interested bidders have a fair opportunity to present a higher-value alternative, and the board has the flexibility to eschew the original transaction and accept

---

[84] *Barkan v. Amsted Industries, Inc.*, 567 A.2d 1279, 1286 (Del. 1989); *see also Unitrin, Inc. v. American General Corp.*, 651 A.2d 1361, 1374 (Del. 1995) ("[E]nhanced judicial scrutiny mandated . . . is not intended to lead to a structured, mechanistic, mathematical exercise . . . [it is] a flexible paradigm that jurists can apply to the myriad of 'fact scenarios' that confront corporate boards.").

[85] *Unitrin*, 651 A.2d at 1385-86 (quoting *QVC*, 637 A.2d at 45-46) ("If a board selected one of several reasonable alternatives, a court should not second guess that choice even though it might have decided otherwise. . . . [C]ourts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness."); *see also Pennaco*, 787 A.2d at 691 ("[T]he court must be mindful that its task [under *Revlon*] is to examine whether the directors have undertaken reasonable efforts to fulfill their obligation to secure the best available price, and not to determine whether the directors have performed flawlessly."); *Toys "R" Us*, 877 A.2d at 1000 ("Critically, in the wake of *Revlon,* Delaware courts have made clear that the enhanced judicial review *Revlon* requires is not a license for law-trained courts to second-guess reasonable, but debatable, tactical choices that directors have made in good faith.").

[86] *See, e.g.*, *Equity-Linked Investors, L.P. v. Adams*, 705 A.2d 1040 (Del. Ch. 1997); *Freedman v. Restaurant Associates Industries, Inc.*, 1990 WL 135923 (Del. Ch. Sept. 19, 1990); *Roberts v. General Instrument Corp.*, 1990 WL 118356 (Del. Ch. Aug. 13, 1990); *In re RJR Nabisco, Inc. S'holders Litig.*, 14 Del. J. Corp. L. 1132 (Del. Ch. 1989); *In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147 (Del. Ch. Aug. 8, 1988).

the higher-value deal.[87] The ability of the stockholders themselves to freely accept or reject the board's preferred course of action is also of great importance in this context.[88]

Here, the Court of Chancery seems to have believed that *Revlon* required C&J's board to conduct a pre-signing active solicitation process in order to satisfy its contextual fiduciary duties.[89] It did so despite finding that C&J's board had no improper motive to

---

[87] *See e.g.*, *Lyondell Chem. Co. v. Ryan,* 970 A.2d 235, 243 (Del. 2009); *In re Dollar Thrifty S'holders Litig.,* 14 A.3d 573, 612–13, 615 (Del. Ch. 2010) (finding that the target board's use of no-shop, matching rights, and termination fee provisions were reasonable even though the company had agreed to deal exclusively with the buyer without conducting a pre-signing market check); *In re MONY Group Inc. S'holders Litig.*, 852 A.2d 9 (Del. Ch. 2004) (finding that the board acted reasonably even though it did not actively shop the company because the board was financially sophisticated, had knowledge of the relevant industry, and there was a "substantial opportunity for an effective market check" after the agreement was announced); *Equity-Linked Investors*, 705 A.2d at 1056-58 (Del. Ch. 1997) (finding that the board acted reasonably under *Revlon* even though it refrained from engaging in an auction, which could have yielded a higher immediate bid); *Herd v. Major Realty Corp.*, 1990 WL 212307, at *9 (Del. Ch. Dec. 21, 1990) ("*Revlon* certainly does not . . . require that every change of control of a Delaware corporation be preceded by a heated bidding contest, some type of market check or any other prescribed format."); *Shamrock Holdings, Inc. v. Polaroid Corp*, 559 A.2d 278, 289 (Del. Ch. 1989) (finding that, in the context of a tender offer, that "where there has been sufficient time for any alternative to be developed and presented and for the target corporation to inform its stockholders of the benefits . . . the 'threat' to the stockholders of an inadequate, non-coercive offer seems, in most circumstances, to be without substance") (internal citations omitted).

[88] *See El Paso*, 41 A.3d at 449 ("[T]he real question is whether the court should intervene when the [] stockholders have a chance to turn down the Merger at the ballot box."); *In re Cogent, Inc. S'holder Litig.,* 7 A.3d 487, 515 (Del. Ch. 2010) (recognizing that "it would be imprudent to terminate the only deal available, when the stockholders can make that decision for themselves"); *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 208 (Del. Ch. 2007) ("In . . . cases when a potential *Revlon* violation occurred but no rival bid is on the table, the denial of injunctive relief is often premised on the imprudence of having the court enjoin the only deal on the table, when the stockholders can make that decision for themselves."); *Toys "R" Us*, 877 A.2d at 1023 ("[T]he bottom line is that the public shareholders will have an opportunity . . . to reject the merger if they do not think the price is high enough in light of the Company's stand-alone value and other options.").

[89] *See* Bench Opinion at 11, 13.

29

sign a deal with Nabors[90] and that the board was well-informed as to C&J's value,[91] and despite the fact that Comstock, one of C&J's largest stockholders, had a strong motive to maximize the value of his shares, and had no reason to do a deal just to secure his (unthreatened) management future. Not only that, but the employer of one of C&J's directors, Ma, was a private equity firm that owned 10% of C&J stock and was therefore unlikely to support a transaction that would compromise the value of its large equity position.[92]

The Court of Chancery imposed a pre-signing solicitation requirement because of its perception that C&J's board did not have "an impeccable knowledge of the value of the company that it is selling."[93] In so ruling, the Court of Chancery seemed to imply that *Revlon* required "impeccable knowledge," and that there was only one reasonable way to comply, *i.e.*, requiring a company to actively shop itself, which ignores the Court of Chancery's own well-reasoned precedent[94] and that of this Court, including our recent

---

[90] *See* Bench Opinion at 12-13 ("[I]t certainly looks as if the board was not conflicted . . . ."); *Orman v. Cullman*, 794 A.2d 5, 28-29 (Del. Ch. 2002) ("No case has been cited to me, and I have found none, in which a director was found to have a financial interest *solely* because he will be a director in the surviving corporation. To the contrary, our case law has held that such an interest is not a disqualifying interest.").

[91] Bench Opinion at 11 ("I have no doubt about the board's knowledge as to the value of C&J.").

[92] As we recently observed in *Iroquois Master Fund Ltd. v. Answers Corp.*, "[w]hen a large stockholder supports a sales process and receives the same per share consideration as every other stockholder, that is ordinarily evidence of fairness, not of the opposite, especially because the support of a large stockholder for the sale helps assure buyers that it can get the support needed to close the deal." 2014 WL 7010777, *1 n.1 (Del. Dec. 4, 2014).

[93] Bench Opinion at 11.

[94] *See* note 87 *supra.*

30

decision in *Lyondell*.[95] And the court's perception that the board was not adequately informed was in tension with its other findings, grounded in the record, that C&J's directors were well-informed as to Nabors CPS' value.[96]

Nor does the record indicate that C&J's board was unaware of the implications of structuring the deal so that Nabors would have majority voting control over the surviving entity.[97] As the undisputed facts demonstrate, the C&J board was aware that Nabors would own a majority of the voting stock of New C&J, and indeed that such a shift in control was required to effect the tax-motivated re-domiciling that the board believed would be beneficial to C&J's stockholders. The board took steps to mitigate the effects of that change in control, including by providing that a two-thirds vote will be required to amend the corporate bye-laws, sell the company, or issue stock for a period of five years; and preventing Nabors from acquiring additional shares or selling its shares for the five year standstill period. Most important, the board negotiated for a bye-law providing that all stockholders will receive *pro rata* consideration in any sale of the company or its assets, a bye-law that cannot be repealed without unanimous stockholder approval.

Although we are reluctant in the context of this expedited appeal to conclude that these provisions were, in themselves, sufficient to take the transaction out of the reach of

---

[95] *Lyondell*, 970 A.2d at 243 (Del. 2009) ("[T]here are no legally prescribed steps that directors must follow to satisfy their *Revlon* duties . . . . Directors' decisions must be reasonable, not perfect.").

[96] *See, e.g.*, Bench Opinion at 5-7.

[97] *See, e.g.*, App. to Opening Br. at 1750, 2377, 2383, 2539.

31

*Revlon*, they do constitute important efforts by the C&J directors to protect their stockholders and to ensure that the transaction was favorable to them.[98]

It is also important to note that there were no material barriers that would have prevented a rival bidder from making a superior offer. As discussed, the C&J board negotiated for a broad "fiduciary out" that enabled the board to terminate the transaction with Nabors if a more favorable deal emerged. This was an unusual protection for a buyer of assets to secure, because sellers (for logical reasons) rarely give buyers such an out. Consistent with his fiduciary duties as a C&J director, Comstock's voting support agreement would fall away upon a decision by the C&J board to exercise its out, leaving him free to vote in favor of a higher priced deal.[99] Therefore, if a competing bidder emerged, it faced only the barrier of a $65 million termination fee.[100] Further, the transaction was announced on July 25, and was not expected to be consummated until near the end of 2014, a period of time more than sufficient for a serious bidder to express interest and to formulate a binding offer for the C&J board to accept.

---

[98] We assume for the sake of analysis that *Revlon* was invoked. We recognize that *QVC* suggests that contractual provisions limiting the power of a majority stockholder and securing the minority's ability to share in any future control premium might take a transaction out of *Revlon*'s reach. *See QVC*, 637 A.2d 34, 42 n. 12. But given the timing exigencies and the fact that this is an issue of first impression before this Court, we decline to reach the question of whether *Revlon* applies.

[99] *See* App. to Opening Br. at 370-77 (Support Agreement).

[100] In the event that C&J stockholders reject the merger, C&J is required to pay Nabors $17 million in "fees and expenses," regardless of whether C&J engages in another transaction thereafter. Nabors Red Lion Limited Form S-4, as filed with the Securities and Exchange Commission on December 1, 2014, at 22, *available at* http://www.cjenergy.com/downloads/Nabors_Red_Lion_Limited_-_Form_S-4_-_Amendment_4.pdf.

In prior cases like *In re Fort Howard Corporation Shareholders Litigation*, this sort of passive market check was deemed sufficient to satisfy *Revlon*.[101] But as the years go by, people seem to forget that *Revlon* was largely about a board's resistance to a particular bidder and its subsequent attempts to prevent market forces from surfacing the highest bid. *QVC* was of a similar ilk.[102] But in this case, there was no barrier to the emergence of another bidder and more than adequate time for such a bidder to emerge. The Court of Chancery was right to be "skeptical that another buyer would emerge."[103] As important, the majority of C&J's board is independent, and there is no apparent reason why the board would not be receptive to a transaction that was better for stockholders than the Nabors deal.

It is also contextually relevant that C&J's stockholders will have the chance to vote on whether to accept the benefits and risks that come with the transaction, or to reject the deal and have C&J continue to be run on a stand-alone basis.[104] Although the C&J board had to satisfy itself that the transaction was the best course of action for stockholders, the board could also take into account that its stockholders would have a

---

[101] *See Fort Howard*, 1988 WL 83147, at *1 ("Here the Special Committee did not conduct an auction of any kind before signing an agreement of merger. . . . It did, however, negotiate provisions purportedly intended to permit an effective check of the market. . . . I have concluded that this approach was adopted in good faith and was effective to give the board an informed, dependable basis for the view that the [buyer's] offer is the best available transaction from the point of view of the [target] shareholders.").
[102] *See QVC*, 637 A.2d at 41.
[103] Bench Opinion at 14.
[104] *See* note 88 *supra.*

fair chance to evaluate the board's decision for themselves.  As the Court of Chancery noted, "[t]he shareholders are adequately informed."[105]

Given these factors, we conclude that the Court of Chancery failed to apply the correct legal analysis when it imposed the injunction.  Because the Court of Chancery could not find that the plaintiffs had met their burden while misapplying *Revlon* and reading it to require an active market check in all circumstances, it certainly could not have found a reasonable probability of success when applying *Revlon* faithfully.

2.    *The Court of Chancery Erred by Entering a Mandatory Injunction Without Applying the Correct Procedural Standard*

For these reasons, the Court of Chancery should not have issued any injunction at all.  But the Court of Chancery also erred by entering a mandatory injunction without applying the correct procedural standard.  The court order provides that C&J is "ordered to solicit alternative proposals to purchase the Company. . . ."[106]  To issue a mandatory injunction requiring a party to take affirmative action – such as to engage in the go-shop process the Court of Chancery required – the Court of Chancery must either hold a trial and make findings of fact, or base an injunction solely on undisputed facts.[107]  Here, the

---

[105] Bench Opinion at 14.  Much of the information that the plaintiffs point to as evidence of the board's breach of its fiduciary duties was disclosed to the stockholders in publically available documents.  As just one example, the details of Citi's relationship with Nabors was disclosed in the Form S-4 Registration Statement.  *See* Nabors Red Lion Limited Form S-4, as filed with the Securities and Exchange Commission on December 1, 2014, *available at* http://www.cjenergy.com/downloads/Nabors_Red_Lion_Limited_-_Form_S-4_-_Amendment_4.pdf.  And the plaintiffs have not challenged the adequacy of the disclosures on appeal.

[106] Injunction Order.

[107] DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY, § 10-2(b)[6] at 10-39 (2001) (quoting *Stahl v. Apple Bancorp, Inc.*, 579 A.2d 1115, 1120 (Del. Ch. 1990)); *see also Steiner v. Simmons*, 111 A.2d

Court of Chancery issued a mandatory injunction on a paper record that surfaced a number of important factual disputes and that was only sufficient to convince the Court of Chancery that the plaintiffs had a plausible merits case. This was error. The plaintiffs here did not seek an expedited trial; they sought a preliminary injunction, and an unusual one at that. The injunction ordered C&J to solicit and negotiate alternative proposals, and stated that doing so would not constitute a breach of the merger agreement, despite the plain language of Section 6.4 of the agreement to the contrary.[108]

Although the equitable authority of our Court of Chancery is broad, it is not uncabined and must be exercised with care and respect for the rights of litigants. The record below did not provide a basis for the Court of Chancery to force Nabors to endure a judicially-ordered infringement of its contractual rights that would, by judicial fiat, not even count as a breach of Nabors' rights.[109] The Court of Chancery made no finding, even on a preliminary basis, that Nabors aided and abetted the C&J's board's alleged

---

574, 575 (Del. 1955) ("[I]t is a well settled principle of equity that a preliminary mandatory injunction will not issue unless the legal right to be protected is clearly established."); *Tebo v. Hazel*, 38 Del. Ch. 116, 127 (1909) (collecting cases that stand for the proposition that "a mandatory injunction, or one which commands the defendant to do some positive act, will not be ordered, except upon a final hearing, and then only to execute the decree or judgment of the court, and never on a preliminary or interlocutory motion") (internal quotation omitted); *El Paso*, 41 A.3d at 449-51 (holding that mandatory injunctive relief is "not a traditional negative injunction that can be done without an evidentiary hearing or undisputed facts"); *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 31 (Del. Ch. 2009); *Toys "R" Us*, 877 A.2d at 1022-23 ("To grant that sort of mandatory relief would . . . be inappropriate on disputed facts, and plaintiffs who seek such relief should move promptly, not for a preliminary injunction hearing, but for an expedited trial."); *City Capital Associates Ltd. Partnership v. Interco, Inc.*, 551 A.2d 787, 795 (Del. Ch. 1988) ("[Affirmative] relief ought not be awarded at this time unless plaintiffs can show that it is warranted based upon facts that are not legitimately in dispute.").
[108] Injunction Order.
[109] App. to Opening Br. at 210 (Merger Agreement at 58).

breach of fiduciary duties.[110] This was unsurprising, given that the plaintiffs did not even make a fair argument below to support attributing liability to Nabors.[111]

Preliminary injunctions are powerful tools, and their bluntness can be disconcerting to plaintiffs, defendants, and trial judges. But the traditional use of a preliminary injunction in the Court of Chancery is to preserve the *status quo*[112] – for example, to enjoin a corporate transaction until there is a full trial if the court believes that there is a reasonable probability a fiduciary breach has occurred – not to divest third parties of their contractual rights. Even after a trial, a judicial decision holding a party to its contractual obligations while stripping it of bargained-for benefits should only be undertaken on the basis that the party ordered to perform was fairly required to do so, because it had, for example, aided and abetted a breach of fiduciary duty.[113] To blue-pencil an agreement to excise a provision beneficial to a third party like Nabors on the basis of a provisional record and then declare that the third party could not regard the excision as a basis for relieving it of its own contractual duties involves an exercise of

---

[110] "The decisions in which the Delaware Supreme Court has issued or affirmed the issuance of injunctions targeted to specific deal protection terms all involved viable claims of aiding and abetting against the holder of third party contract rights." *OTK Assocs. LLC v. Friedman*, 85 A.3d 696, 720 n.2 (Del. Ch. 2014).

[111] Indeed, the plaintiffs did not make any mention of Nabors' alleged aiding and abetting liability until their reply brief below, and then only in a cursory way. *See* Reply Br. at 34.

[112] *See, e.g.*, *Hazel*, 38 Del. Ch. at 117 ("A 'preliminary injunction' decides no facts, fixes no right, and is not at all necessary to the final determination of the cause. It is mere process of the court, issued to hold in statu quo the subject-matter upon which the decree is to operate until the court shall be enabled to ascertain and adjudicate the rights of the parties.").

[113] *See, e.g.*, *Richard Paul, Inc. v. Union Improvement Co.*, 86 A.2d 744, 748 (Del. Ch. 1952) ("Relief by mandatory injunction should only be awarded in a clear case, free from doubt, and when necessary to prevent irreparable injury.").

judicial power inconsistent with the standards that govern the award of mandatory injunctions under Delaware law.[114]

That is especially the case when the stockholders subject to irreparable harm are, as here, capable of addressing that harm themselves by the simple act of casting a "no" vote.[115] In a situation like this one, where no rival bidder has emerged to complain that it was not given a fair opportunity to bid,[116] and where there is no reason to believe that stockholders are not adequately informed or will be coerced into accepting the transaction if they do not find it favorable, the Court of Chancery should be reluctant to take the decision out of their hands.[117] Moreover, almost any judicial injunction, much less one of this unusual kind, creates a greater risk that the underlying transaction might not be available to the stockholders after the injunction is lifted.[118] And there is also the

---

[114] *See, e.g.*, *In re Netsmart Technologies, Inc. S'holders Litig.*, 924 A.2d 171, 209 (Del. Ch. 2007) (declining to enjoin the transaction because the court could "perceive no basis where [it] would have the equitable authority to require [buyer] to remain bound to complete their purchase of [target] while simultaneously reforming the Merger Agreement to increase their transactional risk in that endeavor" and finding that such an "an unusual exercise of authority" was not justified absent a showing of buyer misconduct); *Toys "R" Us*, 877 A.2d at 1021 ("The central purpose of *Revlon* is to ensure the fidelity of fiduciaries. It is not a license for the judiciary to set arbitrary limits on the contract terms that fiduciaries acting loyally and carefully can shape in the pursuit of their stockholders' interest.

[115] *See El Paso*, 41 A.3d at 449; *Netsmart*, 924 A.2d at 208; *Toys "R" Us*, 877 A.2d at 1023.

[116] *See Pennaco*, 787 A.2d at 715 ("The court is also unconvinced that other sophisticated energy companies lack the information they need to determine whether to make a topping bid, given the abundance of information that is publicly available about Pennaco and its potential.").

[117] *McMillan v. Intercargo Corp.*, 1999 WL 288128, at *4 (Del. Ch. May 3, 1999) ("The shareholders are not threatened with irreparable harm, because it is they who in the end will decide whether or not the company will be sold now. As long as the shareholders' decision is informed, the choice between whether or not to merge will be voluntary and cannot in any legally meaningful sense be said to threaten irreparable harm.").

[118] Under Section 7(e) of the parties' merger agreement, it is a condition precedent to the obligation of both parties that "No temporary restraining order, preliminary or permanent injunction or other order or judgment issued by any Governmental Entity of competent jurisdiction (an 'Injunction') enjoining or prohibiting the consummation of the Merger shall be in

important issue of whether C&J's breach of the no-solicitation clause of the contract would excuse Nabors from closing if it determined doing so was in its interests.[119]

We are mindful that an after-the-fact monetary damages case is an imperfect tool, and we acknowledge that there are colorable questions about the interests of certain key players in the transaction that have not been fully explored given the expedited nature of the proceedings. But, as noted, the Court of Chancery did not find that the plaintiffs' duty of loyalty claims had any merit based on the record,[120] and could not even find a reasonable probability of success as to any care-based breach of fiduciary duty claim. To rely on this insufficient premise to issue a powerful mandatory injunction, when no rival transaction was available, and when the stockholders can reject the deal for themselves if they do not find its terms to be value-maximizing, was an error.

For all these reasons, the order of the Court of Chancery is hereby REVERSED. The mandate shall issue immediately.

---

effect. There shall not be any action taken, or any law, rule, regulation or order enacted, entered or enforced in respect of the Merger, by any Governmental Entity of competent jurisdiction that makes the consummation of the Merger illegal." App. to Opening Br. at 229 (Merger Agreement at 77). In this case, enjoining the merger for 30 days poses substantial risk, because Section 8.1(c) of the merger agreement provides that if the merger has not been consummated by December 31, 2014, either party may terminate the agreement, with no exception for delays caused by a court-imposed injunction. App. to Opening Br. at 231 (Merger Agreement at 79).

[119] It is a general principle of contract law that a party's prior material breach can discharge the other party's obligation to perform, or at least allow the other party to recover damages for the breach. *See* 14 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 43.5 (4th ed. 2003). The Court of Chancery has previously refused to grant a preliminary injunction that would result in a "breach of fundamental [merger agreement] provisions" in similar cases. *El Paso*, 41 A.2d at 434 ("[Plaintiff seeks] to keep [buyer] bound but to allow [target] to prospect for more. I understand that, but they are stuck with the requirements of equity, which is that they accept the risks that come with enjoining the Merger, including the risk that [buyer] will walk when the drop-dead date expires."); *see also Netsmart*, 924 A.2d at 209.

[120] Bench Opinion at 13.